**Herbert T. SILVER d/b/a Allied Bond and Collection Agency, Plaintiff-Appellant,**

v.

**Brian J. WOOLF, in His Capacity as Acting Banking Commissioner of the State of Connecticut, Defendant-Appellee.**

No. 243, Docket 82–7468.

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1982.

Decided Nov. 15, 1982.

Certiorari Denied April 4, 1983.
See 103 S.Ct. 1525.

Robert N. Wienner, Hartford, Conn. (Robert B. Shapiro, Cohn & Birnbaum, P.C., Hartford, Conn., of counsel), for plaintiff-appellant.

John G. Haines, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., Hartford, Conn., of counsel), for defendant-appellee.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

RALPH K. WINTER, Circuit Judge:

Allied Bond and Collection Agency ("Allied") brought this action against the Banking Commissioner of Connecticut in the District Court for the District of Connecticut, Blumenfeld, *Judge,* seeking declaratory and injunctive relief against the enforcement of Conn.Gen.Stat.Ann. §§ 42–127—42–133a (West Supp.1982). Allied claimed that this legislation, which requires the licensing of, and otherwise regulates, interstate debt collection agencies is unconstitutional. Judge Blumenfeld granted summary judgment for the Commissioner, 538 F.Supp. 881. We affirm.

## BACKGROUND

Allied is a consumer collection agency located in Pennsylvania. It claims to collect debts on behalf of its clients from debtors located in all 50 states and in several United States territories and foreign countries. Allied has no offices, employees, or property in Connecticut and seeks to collect outstanding debts from Connecticut debtors solely through mail and telephone communications. From 1978 through 1981, Allied had approximately 14,580 accounts in Connecticut on which it collected some $576,415.

Until 1981, Allied's clients included several major oil companies, notably Atlantic Richfield Oil Company (ARCO), Mobil Oil Corporation and Shell Oil Company. In recent years, six Connecticut residents have complained to the Banking Commissioner about Allied's collection activities. Four of the complaints received concerned Mobil, ARCO, and Shell. The Banking Commissioner contacted these companies and informed them that Conn.Gen.Stat.Ann. § 42–131a(b) prohibited creditors from engaging the services of a collection agency which had not obtained a license in Connecticut. That section states in part:

> No creditor shall retain, hire, or engage the services ... of any person who engages in the business of a consumer collection agency and who is not licensed to act as such by the commissioner, if such creditor has actual knowledge that such person is not licensed ...

As a result, the three oil companies ceased to engage Allied with respect to debtors

located in Connecticut, thereby reducing Allied's volume of Connecticut accounts by more than 50 percent.

On September 14, 1981, the Commissioner issued a Notice of Hearing ordering Allied to appear and to show cause why it should not be ordered to cease and desist from continuing its business without obtaining a license pursuant to Conn.Gen.Stat.Ann. § 42–127a(a), which reads:

> No person shall act within this state as a consumer collection agency, unless such person holds a license . . . from the commissioner . . . A consumer collection agency is acting within this state if it . . . (2) has its place of business located outside this state and collects from consumer debtors who reside within this state for creditors whose place of business is located within this state; or (3) has its place of business located outside this state and regularly collects from consumer debtors who reside within this state for creditors whose place of business is located outside this state.

Allied, which does not contest its status as a "consumer collection agency," raised a constitutional challenge to the licensing requirement at the administrative hearing but the hearing examiner declined to consider it. Thereafter, Allied filed this action in the district court seeking a declaration that section 42–127a(a) was unconstitutional on its face and as applied and an injunction against the enforcement of section 42–127a(a) and section 42–131a(b), to the extent the latter might be enforced against Allied's clients. The district court granted the Commissioner's motion for summary judgment and dismissed Allied's complaint. This appeal followed. We affirm.

## DISCUSSION

The regulatory scheme of the Connecticut consumer debt collection statute is not complex. Section 42–127a(a) prohibits any person from acting as a consumer collection agency within the state without having first obtained a license from the Banking Commissioner. In order to obtain a license, the debt collection agency must submit a written application, accompanied by a sworn financial statement, aggregate fees of $250, and evidence that the applicant is "of good moral character and financially responsible." Conn.Gen.Stat.Ann. § 42–127a. The Commissioner is empowered to examine a collection agency's books and records in aid of the licensing determination or the enforcement of other aspects of the statutory scheme. An applicant must also post a bond of $5,000 to ensure a true accounting of all funds collected. Conn. Gen.Stat.Ann. § 42–128a. The Commissioner may suspend or revoke a license for cause, after notice and a hearing. Conn. Gen.Stat.Ann. § 42–129a.

Section 42–131 lists certain prohibited practices. For example, a debt collection agency may not furnish legal advice, communicate with debtors in the name of an attorney, or retain or terminate an attorney in any legal action against a debtor on behalf of a creditor without having first received the creditor's written authorization to act as the creditor's agent. No such agency may solicit claims under deceptive or ambiguous contracts, advertise or threaten to advertise to sell claims, or add to any claim an amount in excess of the debtor's legal obligation. Agencies must account to the creditor for all monies collected.

Section 42–131a(a) prohibits a consumer collection agency from violating any portion of the statute's regulatory scheme. This section empowers the Banking Commissioner to "examine the affairs of every consumer collection agency in [the] state." Subsection (b) provides that creditors may not knowingly engage the services of an unlicensed consumer collection agency.

Allied asserts two grounds on which the Connecticut legislation is unconstitutional. First, it claims to be an exclusively interstate business with insufficient contacts in Connecticut to require it to obtain a license as a condition of collecting debts from Connecticut residents by phone or by mail. Second, Allied argues that, while the Connecticut licensing requirement and associated regulation of the conduct of debt collection are not burdensome in and of them-

selves, the "prospect of multiple and probably inconsistent" regulation by a large number of states would so burden firms such as Allied as to make national debt collection from a single office all but impossible. We reject both contentions.

### 1. The Licensing Requirement

Allied's *per se* challenge to the licensing requirement is based almost exclusively upon *Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974). In that case, the Supreme Court invalidated a Mississippi requirement that a Tennessee cotton merchant obtain a Certificate of Authority as a foreign corporation doing business in the state before using state courts to enforce its contracts. The merchant had neither offices nor employees in Mississippi. The underlying contracts were with farmers for cotton to be grown in the future and were an integral part of a national market in cotton futures which allowed merchants such as Allenberg to stabilize their position with respect to future contracts for sale to customers in several states. Notwithstanding the fact that the contracts Allenberg sought to enforce were executed in Mississippi and title to the cotton passed upon delivery to a warehouse within that state, the Court held that Allenberg's contacts with Mississippi "do not exhibit the sort of localization or intrastate character," *id.* at 33, 95 S.Ct. at 267, necessary to allow a state to condition access to its courts upon qualifying to do business there.

The precise impact of *Allenberg* on other factual situations is not self-evident. While Justice Douglas' opinion is at great pains to describe the "intricate interstate marketing mechanism" in cotton futures, *id.* at 29, 95 S.Ct. at 265, and the essentiality to that mechanism of enforceable contracts with farmers for cotton to be grown in the future, it offers few limits to its rationale since a similarly high degree of integration is a ubiquitous feature of modern economies.

Allied is thus able to construct a plausible argument based upon *Allenberg* since it too has no offices or employees in Connecticut and its business is an integral part of the marketing of products on a national scale by national or multinational corporations. The debts it seeks to collect directly affect commerce since defaults upon consumer contracts and costs of collection must affect the price of goods distributed in interstate commerce and, therefore, the amount of that commerce. Nevertheless, we would have to blind ourselves to the many important distinctions between *Allenberg* and the present case were we to reverse solely upon the basis of that decision. These distinctions fall into two categories, either of which alone might be sufficient to uphold the Connecticut statute, both of which together are more than adequate. First, the contacts between Allied's business and Connecticut are significantly different from those involved in *Allenberg.* Second, unlike the situation in *Allenberg,* Congress has affirmatively indicated that it considers the kind of state regulation at issue here to be desirable.

Unlike *Allenberg,* the licensing scheme here is an integral part of a precise regulatory scheme. The function of the license is to provide an easy means of enforcing the substantive regulation of debt collection. Thus, a collection agency which violates the regulatory scheme may lose its license and the creditor firms which hire it can then be forced to change agencies. *Allenberg* involved a statute applicable to all foreign corporations without regard to either the nature of their business or the interest of the state in regulating it. The licensing was not an integral part of an otherwise valid regulatory statute and was thus viewed by the majority as a naked restriction on interstate firms. The licensing requirement here, on the other hand, must be viewed as part of an overall regulatory scheme relating to debt collection.[1]

---

1. Allied has explicitly eschewed any particularized challenge to the Connecticut regulatory scheme other than the licensing requirement.

We may assume for purposes of this case, therefore, that the regulations and prohibitions of the legislation are constitutional.

Debt collection practices have long been viewed as a proper matter for regulation by the states. Quite apart from statutory regulation, see Scott and Strickland, *Abusive Debt Collection—A Model Statute for Virginia*, 15 Wm. & Mary L.Rev. 567, 573–578 (1974), such practices have generated a substantial amount of state litigation sounding in common law tort. *See generally*, Annot., 64 A.L.R.2d 100 (1959); Annot. 15 A.L.R.2d 108 (1951). Indeed, the principal source of resistance to federal regulation of debt collection has been the view that it is a matter "best left to the states." S.Rep. No. 382, 95th Cong., 1st Sess. 9, *reprinted in* 1977 U.S.Code Cong. & Ad.News 1695, 1703 (separate views of Messrs. Schmitt, Gam and Tower). The reason for state involvement in such regulation is self-evident. While the methods of communication utilized by debt collectors may, as in Allied's case, be interstate, the perceived abuses and consequent harm—abusive language and threats followed by feelings of insult and humiliation and an urge to pay a disputed debt solely to avoid further harassment—are almost entirely localized.

Moreover, agencies such as Allied are not enforcing their own contracts, as in *Allenberg.* Instead, they generally seek to collect on contracts entered into by companies which have a multitude of contacts with Connecticut. The contracts and resultant debts are entirely local and much of the Connecticut regulation enforced by the licensing requirement effectuates important local interests, *e.g.,* requiring that monies paid to collection agencies be used to satisfy the underlying debts. Conn.Gen.Stat.Ann. §§ 42–131(i), (k), (*l*). Finally, a requirement that companies doing business in Connecticut not hire unlicensed collection agencies is a method of preventing firms doing business in Connecticut from evading concededly valid regulation of their contract enforcement methods by hiring out-of-state agencies.

Moreover, debt collection practices are intimately related to the use of state courts and the regulation of the practice of law in those courts. Some provisions of the Connecticut statute are explicitly aimed at preventing the illegal practice of law and otherwise regulate the relationship of collection agencies to Connecticut attorneys. *See e.g.,* Conn.Gen.Stat.Ann. §§ 42–131(a), (b), (e). We think *Allenberg* no more prohibits a licensing requirement as a remedy for such regulation of debt collection than it prevents Mississippi from requiring that the Allenberg Cotton Co. hire an attorney licensed or admitted *pro haec vice* in that state to initiate contract actions in its courts.

We believe, therefore, that the local interests served by the use of a licensing mechanism as a regulatory device in the case of the Connecticut statute are significantly different from those at issue in *Allenberg.* Even Justice Rehnquist's dissent in *Allenberg,* for example, mentions as significant local interests only the facilitation of tax collection, ease in service of process and dissemination of financial information. 419 U.S. at 40–41, 95 S.Ct. at 270–271. The majority, however, left open the question of whether Allenberg's contacts were sufficient to allow imposition of local taxes and service of process in Mississippi. Under these circumstances, we decline to read *Allenberg* as establishing a *per se* rule prohibiting the licensing of interstate businesses in order to facilitate the enforcement of an otherwise valid scheme of state regulation. Indeed, this appears to be the substance of the Supreme Court's decisions on the licensing of interstate businesses. *See, e.g., Robertson v. California*, 328 U.S. 440, 452–459, 66 S.Ct. 1160, 1166–1170, 90 L.Ed. 1366 (1946).

*Allenberg* is distinguishable upon a second ground: in that case, Congress had not expressed any views as to the legitimacy of the Mississippi law; in the present case, there are affirmative indications that Congress believes state regulation of debt collection agencies to be desirable.

 That is a crucial distinction for whatever decision a federal court might render as to the validity of a state law regulating commerce in the absence of congressional action, Congressional approval of

such laws is decisive in their favor. The power of federal courts to invalidate state laws burdening interstate commerce is derived from the so-called negative implications of the Commerce Clause. Although a matter of some doubt and much debate in earlier times, *see generally* Brown, *The Open Economy: Justice Frankfurter and the Position of the Judiciary,* 67 Yale L.J. 219, 219–223 (1957); Dowling, *Interstate Commerce and State Power,* 27 Va.L.Rev. 1, 2–8 (1940), the power of federal courts to invalidate state laws which "retard, burden or constrict the flow of . . . commerce," *H.P. Hood & Sons v. Du Mond,* 336 U.S. 525, 533, 69 S.Ct. 657, 662, 93 L.Ed. 865 (1949) is now well established but subject to a critical qualification stemming from the Commerce Clause. That provision is not a direct prohibition on state action; instead it empowers the federal legislature to regulate the subject matter. As such, it provides, at best, a negative implication supporting such judicial authority. Indeed, one distinguished constitutional scholar has pointed out that "the [negative] textual inference never was a very good one," Black, *Structure and Relationship in Constitutional Law* 21 (1969) and that the disabilities of the states so far as interstate commerce are concerned flow as much from the political structure of a constitution establishing a single nation as from the text of the Commerce Clause. That is a point well taken and one which fully explains judicial invalidation of burdensome or discriminatory state laws where Congress is silent. Nevertheless, the constitutional text empowering Congress is directly relevant so far as the relative powers of different branches of the federal government over such laws are concerned. A state law which a federal court might invalidate where Congress is silent will thus be upheld where Congress has indicated its desire to allow states to act. *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946).

The federal Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692*o* (Supp. IV 1980) legislates in the same area regulated by the Connecticut statute in issue. It contains the following provision:

This subchapter does not annul, alter or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

18 U.S.C. § 1692n.

■ We regard this provision as more than sufficient to authorize the licensing of interstate debt collection agencies as a method of enforcing otherwise valid regulatory measures. Congress hoped that the states would address the problem of abusive debt collection methods and enact "stronger" laws. S.Rep. No. 382, *supra,* at 6. Unlike statutes such as that at issue in *Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), involving clauses which preserved only the existing state power in the particular area, section 1692n affirmatively expresses Congress' approval of more stringent state legislation. As we indicate in the next section, section 1692n may not be a *carte blanche* for any and all state legislation, no matter how burdensome or even prohibitive, but it certainly authorizes a simple licensing requirement as a remedial measure in aid of otherwise valid state regulation. Allied has demonstrated no particularly onerous burden imposed by such a requirement but instead has relied upon a *per se* argument based on a literal reading of *Allenberg.* Since *Allenberg* did not involve a federal statute such as section 1692n, it is wholly distinguishable.

2. *The Cumulative Burden of State Regulation*

■ Allied also argues that, while the Connecticut statutory scheme does not in and of itself impermissibly burden commerce, "the prospect of 30 or more state

licenses, each with its own regulatory idiosyncracies, would make the conduct of a national business from a single location impossible...." Brief for Appellant at 24. This argument is quite distinct from the challenge to the licensing requirement. Local interests may be insufficient to justify state legislation which, because it differs from the laws of other states, significantly burdens commerce. *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (truck length limits interfering with the "interlining" of interstate trailers); *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (idiosyncratic mudguard law interfering with "interlining"); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (train limit law forcing interstate trains to be broken up and reformed at the Arizona line). Moreover, while section 1692n authorizes state laws affording "greater ... protection" to debtors, we are not prepared to say that it authorizes state legislation which in the aggregate might effectively prohibit interstate debt collection agencies from operating.

■ Appellant's argument fails, however, because it is totally speculative. Apart from arguing that compliance with differing state requirements as to recordkeeping might be prohibitively costly, Allied simply has not designated statutory regulations here or elsewhere which in the aggregate might constitute an impermissible burden on commerce. Unlike *Southern Pacific, Bibb,* and *Raymond,* a specific burden resulting from disparate state regulation simply has not been shown. No colorable claim is made, for example, that the cumulative impact of state licensing fees or bonding requirements is prohibitive, that specific regulatory requirements or prohibitions in the different states are so disparate as to limit interstate operations, or even that Allied itself has been unduly limited in conducting its business as a consequence of state regulation. So far as recordkeeping requirements are concerned, Allied makes no claim that Connecticut even requires particular methods of recordkeeping, much

less that such a requirement in connection with the differing requirements of other states is unduly burdensome. Instead, Allied asks us to render the legislation invalid because of "the prospect" of an impermissible aggregate burden on commerce. Courts are not in the business of deciding the legality of such "prospects." Judge Blumenfeld thus properly granted summary judgment.

Affirmed.