UNITED STATES of America

v.

Robert J. TAYLOR, Defendant.

Crim. No. 83–00004–B.

United States District Court,
D. Maine.

April 25, 1984.

Richard S. Cohen, U.S. Atty., F. Mark Terison, Asst. U.S. Atty., Portland, Maine, for the U.S.

E. Paul Eggert, Portland, Maine, for defendant.

## RULING ON MAGISTRATE'S REPORT AND RECOMMENDED DECISION

CYR, Chief Judge.

The defendant[1] has been charged in a two-count indictment[2] alleging violations of 16 U.S.C. §§ 3372 and 3373, also known as the Lacey Act Amendments of 1981, which make it a federal offense for any person "to import, export, transport, sell, receive, acquire or purchase in interstate ... commerce (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law ... of any State...." 16 U.S.C. § 3372(a)(2). The relevant state statute, 12 M.R.S.A. § 7613, provides that "[a] person is guilty of importing live bait if he imports into this State any live fish, including smelts, which are commonly used for bait fishing in inland waters."

The defendant moved to dismiss the indictment on the ground that section 7613 places an impermissible burden on interstate commerce in violation of the Commerce Clause of the United States Constitution.

After a hearing on defendant's motion, which included extensive expert testimony, the Magistrate recommended that the motion be denied. Finding that the Lacey Act Amendments do not insulate section 7613 from constitutional attack[3]

---

1. Defendant, a Maine resident, is engaged in raising golden shiners for commercial sale. Tr. 144. According to his testimony, he is unable to harvest a sufficient number of golden shiners to meet public demand, especially during the winter ice fishing season when the demand for live bait fish exceeds the supply. Tr. 147.

2. Count I alleges that the defendant conspired to bring into the State of Maine live golden shiners commonly used for bait fish. Count II charges the defendant with actually bringing the shiners into the state.

3. The Magistrate correctly found that the Lacey Act Amendments do not incorporate all existing state laws regulating possession, transportation, or sale of fish. While the Lacey Amendments were viewed by Congress "as a Federal tool to aid the States in enforcing their own laws concerning wildlife," S.Rep. No. 97–123, 97th Cong. 1st Sess., *reprinted in* 1981 U.S.Code Cong. & Ad.News 1748, 1749 (Senate Report), there is nothing in either the statute or its legislative history which expresses the clear intent of Congress that the Lacey Act Amendments are meant to insulate state legislation from attack under the Commerce Clause. *Cf. New England Power Co. v. New Hampshire*, 455 U.S. 331, 341–43, 102 S.Ct. 1096, 1101–02, 71 L.Ed.2d 188 (1982); *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44–49, 100 S.Ct. 2009, 2019–22, 64 L.Ed.2d 702 (1980). *See also Silver v. Woolf*, 694 F.2d 8, 13 (2d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983).

and applying the balancing test set out in *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979),[4] the Magistrate concluded that, although facially discriminatory, section 7613 serves a legitimate local interest and that the state had demonstrated that there are no feasible alternative means for promoting the state's interest in preserving its wild fish population short of the outright ban imposed by section 7613.

Defendant raises two objections to the Magistrate's report and recommended decision.[5] First, defendant contends that the Magistrate erred in finding that section 7613 serves a legitimate local interest. Second, defendant argues that the record clearly establishes the feasibility of less discriminatory alternatives which would adequately safeguard the state's purported interest.

▊ Although a state's interest in conservation and protection of wild animals is a legitimate local purpose, similar to the state's interest in protecting the health and safety of its citizens,[6] where a state regulation facially discriminates against interstate commerce, as here, "such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of non-discriminatory alternatives." *Hughes v. Oklahoma*, 441 U.S. at 337, 99 S.Ct. at 1737.

At the hearing before the Magistrate the Government argued that section 7613 serves two important state interests: controlling the spread of disease among Maine's wild fish population, and preventing the introduction of exotic species of fish into the State of Maine. Tr. 12.

In support of its assertion that imported bait fish, especially golden shiners, pose a serious threat to the indigenous wild fish population, the state identified three particular parasites which might be found in imported bait fish. The first, capillaria catastomi, is a small round worm which embeds itself in the lining of the gut of the host fish and causes enteritis, an inflammation of the intestinal lining of the fish. Tr. 14–15. According to the fish pathologist for the Maine Department of Inland Fisheries and Wildlife (Fisheries), this particular parasite is not native to the State's wild fish population but first began to appear in the winter of 1983, probably as the result of illegal fish importation. Tr. 15–16. The Fisheries expert stated that this parasite presents a debilitating disease which slows the growth of the fish and in some cases is serious enough to kill the fish. Tr. 15. This particular parasite was found to exist in low to moderate numbers in the shipment of golden shiners seized from defendant. Tr. 16.

The defendant's expert testified that capillaria catastomi is not unique to golden shiners and that, at least according to a colleague, it is debatable whether the parasite is a true pathogen. Tr. 111–112. Defendant's expert testified that, at least in the environment of commercial bait fish hatcheries, this parasite is most commonly

---

**4.** Under this test, the Court must inquire:

(1) whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Id.* at 336, 99 S.Ct. at 1736.

**5.** The Magistrate rejected defendant's argument that section 7613 is an economic protectionist measure, and defendant has not renewed this contention. *See Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d

475 (1978) ["whatever (the state's) ultimate purpose, it may not be accomplished by discriminating against articles of interstate commerce from outside the state unless there is some reason, apart from their origin, to treat them differently."].

**6.** The passage of the Lacey Act Amendments clearly lends support to the legitimacy of the state's interest in protecting its fish. In an effort "both to ensure that endangered species are not further threatened with extinction, and to afford management of healthy wildlife populations for hunting and other recreational purposes," the amendments were designed to encourage states "to protect a broad variety of species." Senate Report at 1749, 1750.

associated with malnutrition and that it is the malnutrition, and not the parasite, which causes the problems of stunted growth in bait fish. Tr. 118, 136. He also stated that this parasite would not affect wild fish to the degree it affects hatchery fish, because hatchery fish are generally more susceptible to disease, due to their close proximity during spawning. Tr. 137.

The second parasite, pleistophora ovariae, is a disease organism which destroys the ability of female fish to reproduce. Tr. 17. The Fisheries expert testified that in commercial hatcheries in the southeastern United States, where this organism is present, there has been an effect on the brood stock. While he was not aware of any studies confirming or denying the parasite's impact in the wild, the Fisheries expert did express the opinion that it would have a negative impact on the wild golden shiner population because the biology of the Maine golden shiner is different from its southern counterpart. Tr. 17–18. The expert also observed that golden shiners are the most intensely cultivated of all bait fish and that it is the golden shiner which is most often shipped to the northeast from the commercial hatcheries in the south.[7] Id. This organism has never been detected in Maine's wild fish population, but was found in some of the seized fish. Tr. 19.

The defendant's expert testified that pleistophora ovariae is strictly a commercial hatchery problem and that while it was possible that it could be transmitted into the wild fish population, an area he had not researched, he did not believe the organism presented any danger. Tr. 107–108, 133.

The third, and apparently most destructive, parasite, bothriocephalus opsalichthydis, more commonly referred to as the Asian tapeworm, embeds itself in the lining of the intestine and prevents the fish from digesting its food. It is often fatal to the host fish. Tr. 19–20. The Fisheries expert testified that this tapeworm has never been detected in Maine's wild fish population and was not present in defendant's shipment, though he stated that he did find it in a fish examined at a local bait store. Tr. 21–22. He also stated that, because this parasite is not host-specific, it could certainly have potentially adverse effects on the entire wild fish population. Id.

Reiterating his position that the Asian tapeworm, like the other parasites, does not present a serious problem, defendant's expert noted that once the tapeworm enters a fish population, and despite a certain mortality rate among the fish, there is little impact after this initial exposure. Tr. 119. At least in commercial hatcheries, defendant's expert stated that the tapeworm is apparently present only where grass carp are also present but that the presence of the carp does not automatically mean that the tapeworm will be found. Tr. 120. He also observed that the greatest danger to salmonids, i.e., salmon, trout and other cold water fish, is not pathogens transmitted by warm water bait fish but those transmitted by salmonids. Tr. 123.

Another asserted state purpose served by section 7613 is the state's interest in preventing the introduction of exotic, or nonindigenous, species into Maine.[8] The Fisheries expert testified that Maine occupies a unique position, in that it has a very limited native wild fish population. Accordingly, the introduction of exotic species would alter the existing environmental balance by increasing competition for food and habitat, as well as in other ways which

7. According to the defendant's expert there are approximately 300 golden shiner producers in the country, with 49 hatcheries in 12 states producing 65 percent of all golden shiners sold commercially. Tr. 109. In terms of its dollar volume, the bait fish industry is second only to the tropical fish business. Tr. 110.

8. The concern is that exotic species will enter the state as part of bait fish shipments. The Fisheries expert testified that bait fish are reared in surface ponds together with other fish. In addition, the bait fish are shipped to intermediate dealers who place all the fish in various holding facilities before distributing the fish to local dealers. Tr. 33–34. Both defendant's expert and the defendant testified that most commercial hatcheries use newly dug ponds in which only one kind of bait fish is raised. Tr. 124, 145–46.

cannot be accurately predicted.[9] Tr. 30, 71–74. He also testified that in the past seven years, seven new species of fish have been introduced into Maine waters, in his opinion the result of illegal smuggling. Tr. 30. When the Fisheries Department has introduced new species, it is done only after extensive research and some understanding of the effects the fish will have on the environment. Tr. 40–41.

Another expert testifying for the Government also noted that Maine is unique, especially for its landlocked salmon fishery. Tr. 68–69. He observed that, given the low fish and food productivity of Maine lakes, introduction of new species of fish would severely tax existing food supplies and upset the environmental balance. Tr. 69, 71.

■ In finding that the Government had demonstrated a significant local interest, the Magistrate concluded and the Court agrees, that the fact that the experts disagree on the seriousness of the parasites and the concomitant danger posed by their introduction into the state, and that it is impossible to predict the long term adverse consequences of exotic species, is not sufficient to taint the legitimacy of the state's interest in excluding them. The Magistrate correctly observed that the constitutional principles underlying the commerce clause cannot be read as requiring the State of Maine to sit idly by and wait until potentially irreversible environmental damage has occurred or until the scientific community agrees on what disease organisms are or are not dangerous before it acts to avoid such consequences.

■ The Court is mindful that the defendant's expert testified that the disease organisms identified by the Fisheries expert, as well as other organisms associated with warm water bait fish, are not considered as serious or of the same magnitude as disease organisms found in cold water fish, which are listed as "reportable diseases." Tr. 106–107, 139. However, the record shows that even as to these "reportable diseases" in cold water fish, the scientific community is not in agreement as to what diseases should be reported and that these determinations, including the testing procedures used, are the subject of considerable scientific debate. Tr. 99, 130. Further, the defendant's expert testimony was confined largely to the effects of disease organisms in commercial hatcheries and, beyond suggesting an inferential connection, see Tr. at 133, he was unable to translate his research and findings into the probable effects these disease organisms might have on Maine's wild fish population. See Tr. at 132–136. In fact, his research has not involved, to any significant degree, the study of cold water fish, nor is he acquainted in any way with the wild fish population of Maine or the northeast. Id.

Given the somewhat unique characteristics associated with Maine's wild fish population, the substantial uncertainties surrounding the effects these organisms have on fish and the unpredictable consequences attending the introduction of exotic species into Maine's wild fish population, the state clearly has a legitimate and substantial purpose in prohibiting the importation of live bait fish.

The defendant contends that the outright ban on the importation of live bait fish imposed by section 7613 is overly burdensome. Defendant argues that most states regulate, rather than prohibit, the importation of live bait fish. Defendant asserts that there are several alternative and less discriminatory procedures which would adequately safeguard the state's interest, including border searches or a requirement of certification that shipments of live bait fish are disease free.[10]

9. As an example, the Fisheries expert described the adverse effects which accompanied the introduction of common carp into the country in the late 19th century. The carp is apparently extremely competitive and adaptable and its introduction has resulted in the displacement of other fish. In Maine, the carp are confined to coastal areas. Tr. 26–27.

10. The defendant does not seriously dispute the impracticability of border searches. See Tr. at 36, 38–39, 75–77.

■ In rejecting the defendant's argument the Magistrate found that the Government had demonstrated that there are no obviously workable alternatives to the outright prohibition of importation and that the expert testimony reveals, if anything, that confident predictions cannot be made as to either the significance of the risk or acceptable means to avoid it. The Magistrate reasoned that the "strictest scrutiny" standard mandated by *Hughes v. Oklahoma, supra,* cannot be read to preclude the state from acting where the evidence on the effectiveness of such alternatives is in doubt and where the potential disruptive impact is great. The Court agrees.

The Fisheries expert testified that there do not presently exist sampling and certification procedures for warm water bait fish. Tr. 31, 33, 38. This testimony is corroborated by another Government expert, *see* Tr. at 97–100, and by the defendant's expert witness as well, *see* Tr. 139, 140. The unavailability of such procedures is due primarily to disagreement among the scientific community. Whereas the defendant's expert testified that no sampling procedures have been devised· because, unlike the pathogens identified in cold water fish, there are no pathogens of equivalent seriousness found in warm water bait fish, the Fisheries expert testified that at least three disease organisms pose a potential, albeit unpredictable, threat to Maine's wild fish population.

■ This disagreement is not, as the defendant suggests, fatal to the Government's case. In the same way that some states permit importation of some fish that others do not, it is entirely within Maine's regulatory authority to promulgate its own list of reportable diseases for warm water bait fish. The real problem is the absence of standardized sampling and certification procedures for bait fish. Both sides agree that it is possible to ·devise certification procedures, *see* Tr. at 60–61, 140, 142, but that abstract possibility does not constitute the applicable standard.[11] *See, e.g., Great Atlantic & Pacific Tea Co., Inc. v. Cottrell,* 424 U.S. 366, 376–78, 96 S.Ct. 923, 930–31, 47 L.Ed.2d 55 (1976); *Dean Milk v. City of Madison,* 340 U.S. 349, 355, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). Even if the state were to promulgate its own list of "reportable diseases" for bait fish and require disease-free certification, and assuming that the state could insist on enforcement of its standards in the source states, *see, e.g., Great Atlantic & Pacific Tea Co., Inc. v. Cottrell,* 424 U.S. at 379, 96 S.Ct. at 931, the fact remains that testing procedures have not yet been devised.[12]

■ The Court finds that the Government has sufficiently demonstrated that less discriminatory methods are not presently available. An important factor, which must be considered in evaluating the availability and feasibility of alternative means of protecting the state's interest, involves the consequences to the state if its actions are disallowed. *See Great Atlantic & Pacific Tea Co., Inc. v. Cottrell,* 424 U.S. at 373, 96 S.Ct. at 928. On this record, the lack of agreement among the experts is not sufficient to justify imposing on the State of Maine the unpredictable and potentially disruptive risks which are present here.

The Court accepts the Magistrate's recommended decision and, accordingly, the defendant's motion to dismiss is hereby DENIED.

SO ORDERED.

---

11. The development of the sampling and certification procedures for salmonids involved years of research and the expenditure of considerable sums of money. *See* Tr. at 33. Even if these procedures could·be used for testing bait fish it would, in all likelihood, take time for the experts to agree on standardized testing procedures in addition to the time required for them to agree on what pathogens would have to be tested for.

12. The same holds true if Maine were to establish its own in-state certification procedures.