**UNITED STATES of America, Appellee,**

v.

**Robert J. TAYLOR,
Defendant, Appellant.**

**No. 84–1699.**

United States Court of Appeals,
First Circuit.

Heard Dec. 4, 1984.

Decided Jan. 18, 1985.

Opinion on Denial of Rehearing and Rehearing En Banc April 10, 1985.

758

E. Paul Eggert, Portland, Me., with whom Mittel & Hefferan, Portland, Me., was on brief, for defendant, appellant.

F. Mark Terison, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief, for United States of America.

H. Cabanne Howard, Asst. Atty. Gen., Augusta, Me., for intervenor State of Maine.

Before BREYER and TORRUELLA, Circuit Judges, and MALETZ,* Senior Judge.

* Of the United States Court of International Trade, sitting by designation.

MALETZ, Senior Judge.

A Maine statute provides: "A person is guilty of importing live bait if he imports into this state any live fish, including smelts, which are commonly used for bait fishing in inland waters." Me.Rev.Stat. Ann. tit. 12, § 7613 (1981). The question presented is whether this statute violates the Commerce Clause, art. I, § 8, cl. 3, of the United States Constitution. We hold that it does and accordingly reverse the district court's denial of defendant's motion to dismiss his indictment under that statute.

### I. Background

Defendant was charged in a two-count indictment under the Lacey Act Amendments of 1981, 16 U.S.C. §§ 3372 and 3373 (1982), which proscribe the importation in interstate commerce of any fish or wildlife taken, possessed, transported, or sold in violation of state law. Id. § 3372(a)(2)(A).[1] The indictment, which included a conspiracy count and a substantive count, alleged that defendant imported into the State of Maine live golden shiners[2] in violation of the blanket prohibition of Me.Rev.Stat.Ann. tit. 12, § 7613. Defendant moved to dismiss the indictment on the ground that the statute violated the Commerce Clause. The district court accepted the magistrate's recommended decision and denied the motion. It concluded that, while the statute discriminated against interstate commerce, it served a legitimate local purpose and that less discriminatory alternatives were not available. 585 F.Supp. 393 (D.Me. 1984). Defendant then entered a condition-

al plea of guilty and reserved his appellate rights. Fed.R.Crim.P. 11(a)(2).[3] This appeal followed.

### II. Contentions of the Parties

The government and intervenor State of Maine concede that section 7613 discriminates facially against interstate commerce. They contend that the statute nevertheless should survive Commerce Clause scrutiny because of (1) Maine's vital interest in excluding fish parasites and exotic species and (2) the unavailability of alternative means that could promote this environmental purpose. The government argues that, in any event, whatever the legitimacy of section 7613 under the Commerce Clause, it is validated by "congressional consent."[4]

The government lists three parasites that might appear in imported bait fish and threaten Maine's indigenous wild fish population: (1) *Capillaria catastomi*, (2) *Pleistophera ovariae*, and (3) *Bothriocephalus opsalichthydis* (Asian tapeworm). It also contends that exotic fish species, which mingle with live bait fish, could enter Maine's waters and damage the native fish population as competitors or predators. According to the government, scientists have not agreed upon sampling and certification procedures that would assure disease-free warm water bait fish. Since golden shiners are extremely small fish,[5] inspection of each fish is concededly impossible.

For his part, defendant introduced evidence that the parasites and exotic species are not a serious threat and that Maine permits importation of other fish that pose analogous problems.[6] In addition, defend-

---

1. Section 3373(d) enumerates federal criminal penalties for violation of the Lacey Act Amendments.

2. The golden shiner, whose scientific name is *Notemigonus cryseleucas,* is a warm water fish that is also known as the American roach. It is "a larger, greenish and golden minnow attaining a length and weight of 30 centimetres and 0.7 kilogram (1½ pounds), [which] is both edible and a valuable bait fish." VI The New Encyclopaedia Britannica 920 (15th ed. 1982).

3. The rule provides:
   With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

4. Congress may "permit the states to regulate ... commerce in a manner which would otherwise not be permissible...." *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). The term "congressional consent" was used in Dowling, *Interstate Commerce and State Power—Revised Version,* 47 Colum.L.Rev. 547, 547 (1947).
   At oral argument, the government abandoned its claim that the Lacey Act Amendments constitute congressional consent to state laws that otherwise violate the Commerce Clause. Maine, however, persists in this claim.

5. The record indicates that the importation leading to the indictment comprised 158,000 fish, with approximately seventy fish to the pound.

6. A summary of the parties' factual contentions appears in the district court's opinion, 585 F.Supp. at 395–98.

ant argues that less burdensome regulatory alternatives are available to Maine and that section 7613 is no more than economic protectionism in the guise of environmentalism.[7] In support of the latter contention, defendant points to a statement submitted by the Maine Department of Inland Fisheries and Wildlife to the Legislature at a time that repeal of the ban on importation of bait fish was being considered.[8] In part, the statement reads:

> [W]e can't help asking why we should spend our money in Arkansas when it is far better spent at home? It is very clear that much more can be done here in Maine to provide our sportsmen with safe, home-grown bait. There is also the possibility that such an industry could develop a lucrative export market in neighboring states.

### III. *The Commerce Clause*

The Commerce Clause provides that "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Clause exerts an impact beyond its literal language:

> Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact such laws imposing substantial burdens on such commerce. [Citations omitted.] It is equally clear that Congress "may redefine the distribution of power over interstate commerce" by "permit[ting] the states to regulate the commerce in a manner which would otherwise not be permissible."

*South-Central Timber Dev., Inc. v. Wunnicke,* — U.S. —, —, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984) (quoting *Southern Pacific Co. v. Arizona ex rel. Sulli-*

van, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945)). In its role as an implied limitation on state power, the Clause is referred to, interchangeably, as the negative Commerce Clause[9] or the dormant Commerce Clause.[10]

■ The Supreme Court has formulated a three-part test for evaluation of state statutes under this Clause:

> [W]e must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

*Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (invalidating statute that placed no limit on number of minnows that could be taken by licensed minnow dealers but forbade any person from leaving the state with more than three dozen minnows). *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). *Cf. Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981) ("When legislating in areas of legitimate local concern, such as environmental protection and resource conservation, States are nonetheless limited by the Commerce Clause.").

■ When the effects on interstate commerce are more than incidental, as they are here (with the government conceding the discriminatory impact of the Maine statute), "the burden falls on the State to justify ... [the statute] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington*

---

7. The district court found that defendant waived the economic protectionism argument. *Id.* at 395 n. 5. We disagree, given defendant's objections to the magistrate's recommended decision, which incorporated all the arguments included in his motion to dismiss.

8. Counsel for the Department stipulated at the hearing on defendant's motion to dismiss that the statement was prepared by one of the government's witnesses, Peter Walker, a fish pathologist of the Department, and his superiors. App.Tr. 150–51. Walker testified that the

statement was the official position of the Department at the time it was written. *Id.* at 62.

9. *See, e.g., W.C.M. Window Co. v. Bernardi,* 730 F.2d 486, 493 (7th Cir.1984); Comment, *The Negative Commerce Clause—A Strict Test for State Taxation of Foreign Commerce,* 13 N.Y.U.J. Int'l L. & Pol. 135 (1980).

10. *See, e.g., South-Central Timber,* — U.S. at —, 104 S.Ct. at 2242; Eule, *Laying the Dormant Commerce Clause to Rest,* 91 Yale L.J. 425 (1982).

*Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). The court is not bound by the state's characterization of its statute but is required, instead, to examine the practical impact of the law. *Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736. "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose [citation omitted] or discriminatory effect [citation omitted]." *Bacchus Imports, Ltd. v. Dias,* —— U.S. ——, ——, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984). If a law ostensibly designed to protect the environment is in reality economic protectionism, there is a " 'virtually *per se* rule of invalidity.' " *Clover Leaf,* 449 U.S. at 471, 101 S.Ct. at 727 (quoting *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)).

■ Nevertheless, even a facially discriminatory statute may survive Commerce Clause scrutiny if it is a legitimate quarantine law. But a statute will not be granted such status merely on the basis of a legislative *ipse dixit.* Thus, in *City of Philadelphia v. New Jersey,* the Supreme Court invalidated a New Jersey statute barring the importation of solid or liquid waste, and distinguished that statute from valid state laws:

> But those quarantine laws banned the importation of articles such as diseased livestock that required destruction as soon as possible because their very movement risked contagion and other evils. Those laws thus did not discriminate against interstate commerce as such, but simply prevented traffic in noxious articles, whatever their origin.
>
> The New Jersey statute is not such a quarantine law. There has been no claim here that the very movement of waste into or through New Jersey endangers health, or that waste must be disposed of as soon and as close to its point of generation as possible.

437 U.S. at 628–29, 98 S.Ct. at 2538. *See Asbell v. Kansas,* 209 U.S. 251, 28 S.Ct.

485, 52 L.Ed. 778 (1908) (upholding cattle inspection law); *Reid v. Colorado,* 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108 (1902) (upholding quarantine on diseased livestock). *Cf. Bowman v. Chicago & N. Ry.,* 125 U.S. 465, 489, 8 S.Ct. 689, 700, 31 L.Ed. 700 (1888) (distinguishing Iowa restriction on importation of liquor from legitimate quarantine laws).

Section 7613 is subject to the same analysis as the New Jersey statute reviewed in *City of Philadelphia.* It is not limited to diseased animals; it encompasses all bait fish. It does not bar all traffic in bait fish; it focuses only on bait fish that come from other states. It does not limit its prohibition to bait fish released into the environment; it bars all importations. In short, section 7613 is not a quarantine statute. Nor, for the reasons that follow, can the statute withstand scrutiny under the three-part test of *Hughes v. Oklahoma.*

### A. *Discrimination Against Interstate Commerce*

■ The government concedes that the statute discriminates against interstate commerce on its face, thus triggering "the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes,* 441 U.S. at 337, 99 S.Ct. at 1737. *Accord Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 958, 102 S.Ct. 3456, 3465, 73 L.Ed.2d 1254 (1982).

### B. *Legitimacy of Local Purpose*

On the issue of legitimate local purpose, the statement by the Department of Inland Fisheries and Wildlife, which emphasizes benefits to local business accruing from section 7613, evinces an aura of economic protectionism, which is "abhorrent to the Commerce Clause." *Hughes,* 441 U.S. at 333, 99 S.Ct. at 1734. Moreover, Maine's total ban on the importation of bait fish is apparently unique among the fifty states, and even Maine accepts importations of cold water fish, subject to a certification procedure.[11] Although Maine is not neces-

---

11. Me.Rev.Stat.Ann. tit. 12, § 7202 (1981), provides:

> **1. Issuance.** The commissioner may grant permits to introduce, import or transport any live freshwater fish or eggs into the State or to receive or have in possession fish or eggs so introduced, imported or transported.

> **2. Application.** Importers shall, when requesting a permit, provide the commissioner with the following information:
>
> **A.** The number and species to be imported;
>
> **B.** The name and address of the source; and

sarily required to lower its environmental standards to those of the other states, or to permit entry of warm water bait fish merely because it accepts cold water fish, the uniqueness of section 7613's ban, together with the indications of economic protectionism, cast doubt on the legitimacy of local purpose.[12]

### C. *Alternative Means*

But even assuming that the statute serves a legitimate local purpose, it cannot survive the third branch of the *Hughes* test. For Maine has not carried its substantial burden of proving that no "alternative means could promote this local purpose as well without discriminating against interstate commerce." *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736.

In *Hughes*, the Court criticized a conservation scheme that chose the method most overtly discriminatory against interstate commerce. *Id.* at 337–38, 99 S.Ct. at 1736–37.[13] The same type of discrimination is present here. Thus, among states that regulate importation of bait fish, some require that shipments of imported fish have disease-free certifications,[14] while at least one state conducts its own inspections of out-of-state fish.[15]

Maine has argued that inspection at its border would be impractical (because the fish would not survive inspection) and that it cannot rely on inspections in other states by individuals not under Maine's supervision. We find it difficult to reconcile this latter contention with Maine's acceptance of such inspections in the case of cold water fish. *See supra* note 11. Furthermore, at oral argument it was suggested that Maine could send its inspectors to hatcheries in other states and require the exporter to pay for the inspection.[16] Without deciding whether such an arrangement would satisfy Commerce Clause requirements, we note that it would impose a far lighter burden on interstate commerce than the present ·absolute prohibition. *Cf. Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354–55, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951) ("If the City of Madison prefers to rely upon its own officials for inspection of distant milk sources, such inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors."). Similarly, a restriction on the number and size of importations would be less restrictive than a total ban. What is more, although the size of golden shiners precludes inspection of every fish

---

**C.** A statement from a recognized fish pathologist, from a college or university, from a state conservation department or from the United States Fish and Wildlife Service, certifying that the fish or eggs are from sources which show no evidence of viral hemorrhagic septicemia, infectious pancreatic necrosis, infectious hematopoietic necrosis, Myxosomo cerebralis or other diseases which may threaten fish stocks within the State.

**12.** Nor is it clear that Maine's statutory scheme is designed to achieve the purported goal of excluding parasites and exotic species. The testimony of two government witnesses is instructive. Peter Walker, a fish pathologist for the Maine Department of Inland Fisheries and Wildlife, indicated that little could be done to prevent fish from swimming over the New Hampshire border into Maine. App.Tr. 49–50. Additionally, Dr. W. Harry Everhart, former Chief of Fisheries for the Department, acknowledged that the state's policy of permitting importation of freshwater fish undermined the putative goals of the bait fish law. *Id.* at 79–81, 88–90.

**13.** While the statute invalidated in *Hughes* permitted exportation of up to thirty-six minnows, Okla.Stat. tit. 29, § 4–115(B)(1) (Supp.1978), the Maine statute effects a total ban on importation.

For purposes of the Commerce Clause, "[i]t does not matter that the State has shut the article of commerce inside the State in one case and outside the State in the other." *City of Philadelphia*, 437 U.S. at 628, 98 S.Ct. at 2537.

**14.** *E.g.*, Wis.Stat.Ann. § 29.535(1)(c) (West Supp.1984).

**15.** Defendant has called to the court's attention a Tennessee regulation providing for inspection of out-of-state fish, which regulation is summarized in Mississippi State University Cooperative Extension Service, *For Fish Farmers*, Sept. 20, 1983, at 6. *Cf.* Minn.Stat.Ann. § 101.42(6) (West 1977) (permits required for importation of minnows); S.D.Codified Laws § 41–14–30 (1977) (same); Utah Code Ann. § 23–15–12 (1976) (permission from wildlife board available for importation of aquatic wildlife); Va. Code § 28.1–183.2 (1979) (administrative permission available for importation of fish or shellfish).

**16.** *Cf.* Cal.Fish & Game Code § 6306 (West 1984) ("The expense of any examination made necessary by the provisions of this code, shall be borne by the owner of the fish, amphibia, or aquatic plants, or the person or persons importing them into this State. . . .").

to be imported, Maine could use sampling techniques similar to those employed by the state on other fresh water fish.[17]

In sum, we cannot accept Maine's contention that nothing short of a total ban on importation will preserve the local interests at stake. Under the strict scrutiny test applicable to facially discriminatory statutes, we cannot believe that Maine has searched for and found the least discriminatory alternative. For this reason, section 7613 cannot pass the test of *Hughes v. Oklahoma.*

### IV. *Congressional Consent*

■ Having found section 7613 repugnant to the Commerce Clause under the *Hughes* test, we turn to Maine's contention that the statute is nevertheless validated by congressional consent.[18] Under the doctrine of congressional consent, even statutes that discriminate egregiously against interstate commerce and foster the "economic Balkanization" that the Framers abjured, *Hughes*, 441 U.S. at 325, 99 S.Ct. at 1730, may be resuscitated at the will of Congress. *See South-Central Timber,* —— U.S. at ——, 104 S.Ct. at 2240.[19] The issue is what Congress has willed.

■ In its brief, the government points to the language and legislative history of the Lacey Act Amendments of 1981 as

**17.** Another alternative emerged in the testimony of Peter Walker, who acknowledged the possibility of raising golden shiners on bait farms set aside for that species alone. App.Tr. 60–61. If imports were limited to shiners grown on such farms, the problem of introducing exotic species into Maine waters would concededly be alleviated.

**18.** At oral argument, the contention was abandoned by the government, but not by Maine. *See supra* note 4.

**19.** The rationale for congressional ability to permit state regulation or taxation that would otherwise be barred by the Commerce Clause is articulated in *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). In sustaining, on the basis of the McCarran Act, a license tax imposed by South Carolina on premiums collected in the state by foreign insurance companies, the Court exposed the logical fallacy in the argument that Congress could not permit that which ordinarily would be barred by the Commerce Clause:

> [I]n all the variations of commerce clause theory it has never been the law that what the states may do in the regulation of commerce, Congress being silent, is the full measure of

evidence that Congress has consented to section 7613. The statute provides in part:

> It is unlawful for any person—
>
> \*   \*   \*   \*   \*   \*
>
> to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—
>> any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law....

16 U.S.C. § 3372(a)(2)(A) (1982).

The government brief construes the statute as conferring congressional approval on any state law restricting commerce in fish or wildlife.[20] Defendant disputes that reading and argues that the Lacey Act Amendments were intended to provide federal assistance for enforcement only of those state laws that are otherwise valid. The district court concluded that the magistrate correctly found nothing in the Lacey Act Amendments or the legislative history indicating an intent to protect state statutes from Commerce Clause scrutiny. 585 F.Supp. at 394 n. 3. We agree.

The legislative history of the Lacey Act Amendments demonstrates that Congress intended to provide "a Federal tool to aid the States in enforcing their own laws concerning wildlife." S.Rep. No. 123, 97th Cong., 1st Sess. 2, *reprinted in* 1981 U.S.

> its power. Much less has this boundary been thought to confine what Congress and the states acting together may accomplish. So to regard the matter would invert the constitutional grant into a limitation upon the very power it confers.

*Id.* at 422–23, 66 S.Ct. at 1151. Of course, it is possible that a statute thus shielded from Commerce Clause scrutiny would fall, nevertheless, under another constitutional provision whose operation cannot be forestalled by congressional consent. *See, e.g., Hicklin v. Orbeck,* 437 U.S. 518, 531–32, 98 S.Ct. 2482, 2490–91, 57 L.Ed.2d 397 (1978) (referring to "mutually reinforcing relationship" of Privileges and Immunities Clause, U.S. Const. art. IV, § 2, cl. 1, and Commerce Clause).

**20.** 16 U.S.C. § 3378(a) provides: "Nothing in this chapter shall be construed to prevent the several States or Indian tribes from making or enforcing laws or regulations not inconsistent with the provisions of this chapter." This provision has nothing to do with the question of congressional consent—and the government does not contend otherwise—since it merely "defines the extent of the federal legislation's preemptive effect on state law." *Sporhase,* 458 U.S. at 959, 102 S.Ct. at 3466.

Code Cong. & Ad.News 1748, 1749. *See United States v. Bryant,* 716 F.2d 1091, 1093 (6th Cir.1983), *cert. denied,* ── U.S. ──, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984). The Amendments were designed to strengthen the enforcement of valid state laws, in the interest of environmental protection. They do not constitute a blank check for all state laws, regardless of their validity under the Commerce Clause.

Congressional intent is demonstrated by the stated goals of cracking down on professional criminals involved in illicit fish and wildlife trade [21] and stemming the flow of diseased animals from abroad.[22]

At best, only one passage in the legislative history arguably denotes congressional consent:

> The current Black Bass Act does not prohibit interstate transportation of fish into a State that prohibits their entry. As an example, California strongly objects to shipments of live white amur carp into California from Arkansas. California has no remedy against the shipper in Arkansas, and the Federal Government cannot intervene in California's behalf under the current law. This problem is solved by the proposed legislation.

*Id.* at 3, *reprinted in* 1981 U.S.Code Cong. & Ad.News at 1750.

We conclude that this single paragraph, which is susceptible of differing interpretations, is insufficient, particularly in the context of a twenty-one-page report, to manifest clear congressional intent to uphold *all* state laws that discriminate against interstate commerce in fish and wildlife. "Reliance on such isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards, and 'a step to be taken cautiously.'" *New England Power Co. v. New Hampshire,* 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982) (quoting *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)) (holding single statement in legislative history inadequate demonstration of congressional consent).

■ The Supreme Court has stated "that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." *South-Central Timber,* ── U.S. at ──, 104 S.Ct. at 2242.[23] Here, an unmistakably clear design to validate state laws cannot be found where the overarching principle embodied in the legislative history is the intent to back up valid state enactments with federal enforcement power.

## V. Conclusion

For the foregoing reasons, the judgment of the district court is reversed and remanded with direction to enter an order dismissing the indictment.

*Reversed.*

## MEMORANDUM AND ORDER

■ The court has considered the petitions for rehearing submitted by the United States and by the State of Maine and has determined that the petitions should be denied. The most serious argument raised in the petitions is the contention that the court should have been bound by the findings of fact made by the district court. The answer to that argument is twofold:

1) The district court's finding that Maine's statute provided the least discrimi-

---

**21.** The first paragraph of the General Statement of the report reads as follows:

> In recent years, investigations by agents of the various agencies charged with enforcing wildlife laws have uncovered a massive illegal trade in fish and wildlife and their parts and products. Evidence indicates that much of this illegal, and highly profitable, trade is handled by well organized large volume operations run by professional criminals. The more sophisticated operations utilize "white collar" crime tactics such as multiple invoicing and other fraudulent documentation to carry out and conceal their illicit activities.

S.Rep. No. 123, 97th Cong., 1st Sess. 1, *reprinted in* 1981 U.S.Code Cong. & Ad.News 1748, 1748.

**22.** The second paragraph of the General Statement provides in part:

> The illegal wildlife trade has grim environmental consequences. It threatens the surviv-al of many species of wildlife, particularly those which we value because of their aesthetic or commercial values. The economic consequences of this trade are also severe. It directly threatens America's agriculture and pet industries and indirectly burdens individual taxpayers. Imported wildlife carry diseases that can affect poultry, livestock, fish and pets. The most important of these diseases is exotic Newcastle disease, which is transmitted by imported birds to native birds, including poultry.

*Id.*

**23.** When it has so intended, Congress has demonstrated ample ability to consent clearly to state statutes. *See Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429–30, 66 S.Ct. 1142, 1154–55, 90 L.Ed. 1342 (1946).

natory alternative was a mixed finding of law and fact. Since this finding entails a legal conclusion, it was entirely appropriate for the court to review it carefully. *See, e.g., Bose Corp. v. Consumers Union of United States, Inc.,___ U.S. ___, ___, 104 S.Ct. 1949, 1959–60 (1984); Pullman-Standard v. Swint,* 456 U.S. 273, 286 n. 16 (1982); *First Nat'l Bank of Hartford, Wis. v. City of Hartford,* 273 U.S. 548, 552 (1927).

2) Although the Supreme Court has observed, under some circumstances, that findings of fact should not be disturbed if supported by substantial evidence, *see Container Corp. of America v. Franchise Tax Bd.,* ___ U.S. ___, ___, 103 S.Ct. 2933, 2946 (1983) (quoting *Norton Co. v. Department of Revenue,* 340 U.S. 534, 537–38 (1951)), it often must perform the same kind of factual examination that the court performed here. *See, e.g., Bacchus Imports, Ltd. v. Dias,* ___ U.S. ___, 104 S.Ct. 3049 (1984) (rejecting Hawaii's argument that okolehao and pineapple wine do not compete with other products sold by liquor wholesalers), *rev'g In re Bacchus Imports, Ltd.,* 65 Hawaii 566, 656 P.2d 724 (1982); *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 328 (1977) (rejecting Court of Appeals holding that transfer tax on securities transactions was not discriminatory), *rev'g* 37 N.Y.2d 535, 337 N.E.2d 758, 375 N.Y.S.2d 308 (1975).

Having stated that the court was free to examine carefully the factual record and to draw its own conclusions, we find the result reached by the panel inevitable. There was no dispute about the applicable legal test, which was quoted in the slip opinion at 6–7. *See Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979). Nor was there any dispute as to the first branch of that test—the statute discriminated against interstate commerce. In applying the three-part *Hughes* test to the Maine statute, the court found that, at a minimum, the statute failed the third part: "whether alternative means could promote [the] ... local purposes as well without discriminating against interstate commerce."

The statute failed the "alternative means" branch of the test because, among other things:

1) Maine provides no protection against in-state parasites and related harms that may exist at large in-state hatcheries;

2) Maine's justifications for failure simply to impose a border inspection system

seem weak in light of its use of such systems in the case of other, and far more seriously harmful, fish parasites;

3) Maine's justifications for failure to use inspection at out-of-state hatcheries (as specifically required in the analogous case of *Dean Milk Co. v. City of Madison,* 340 U.S. 349 (1951)) is nonexistent;

4) There is at least some direct evidence in the record of economic protectionism as a motive; and

5) The statute seems ineffective to achieve its purported goal, since fish may swim into Maine over the New Hampshire border and since the former Chief of Fisheries testified that Maine's permitting the importation of freshwater fish undermined the effectiveness of the bait fish law.

We have re-examined the record in light of the rehearing petitions. Although we understand that here—as in many complex and fact-specific cases—the government may disagree with the court's reading of the evidence, we see no purpose to be served either in reading the lengthy evidentiary record yet again or in asking another group of appellate judges to do so. We therefore deny the petitions for rehearing.