USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1254 CHRISTINE STOWELL, ET AL., Plaintiffs, Appellants, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee. ________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ _________________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ Patrick Ende, with whom Jack Comart and Pine Tree Legal _____________ ____________ ________________ Assistance were on brief, for appellants. __________ Robin S. Rosenbaum, Attorney, Civil Division, U.S. _____________________ Department of Justice, with whom Stuart Schiffer, Acting _________________ Assistant Attorney General, Jay P. McCloskey, United States __________________ Attorney, and Barbara C. Biddle, Attorney, U.S. Department of __________________ Justice, were on brief, for appellee. Christopher C. Leighton, Deputy Attorney General, with whom _______________________ Michael E. Carpenter, Attorney General, and Thomas D. Warren, _____________________ _________________ Deputy Attorney General, were on brief for State of Maine, amicus curiae. _________________________ September 10, 1993 _________________________ SELYA, Circuit Judge. Although this appeal presents an SELYA, Circuit Judge. _____________ issue of first impression that requires us to navigate a complex maze of statutes and regulations, its resolution turns on the interpretation of two words in common usage. We hold, as did the court below, that the Secretary of Health and Human Services (the Secretary) permissibly concluded that the term "payment levels" as used in 42 U.S.C. 1396a(c)(1) (1988) refers to baseline payments received under the Aid to Families with Dependent Children (AFDC) program. Consequently, we affirm. I. BACKGROUND I. BACKGROUND AFDC is a voluntary, cooperative federal-state social service program paid for by both sovereigns but administered largely by the states. See 42 U.S.C. 601-615 (1988 & Supp. ___ III 1991); see also Doucette v. Ives, 947 F.2d 21, 23-24 (1st ___ ____ ________ ____ Cir. 1991) (describing interactive nature of AFDC program). For heuristic purposes, we limit our discussion of this intricate program to the particular problem around which this case revolves. Through AFDC, poor families receive a monthly stipend (the basic AFDC grant). The amount of the stipend varies from state to state and also varies according to family size. If a family unit has some other income, say, child support payments, most states deem this money to offset the guaranteed AFDC stipend pro tanto. Under such a regime, a dollar is subtracted from the ___ _____ family's basic AFDC grant for every dollar of supplemental income received. See, e.g., Hassan v. Bradley, 818 F. Supp. 1174, 1176 ___ ____ ______ _______ 2 & n.4 (N.D. Ill. 1993) (describing methodology and identifying states which employ it). A few states, Maine among them, take a less conventional approach to supplemental income. Up to a point, Maine permits a family to receive such income without offsetting it against the basic AFDC grant. Only when the family's aggregate income reaches a designated level a level that Maine calls the "standard of need" does Maine begin to shrink the basic AFDC grant in proportion to the marginal amount of supplemental income received. In the bureaucratic idiom, this phenomenon is known as "gap filling" because no offsets are made until the family's supplemental income has filled the gap between the stipendiary amount of the basic AFDC grant and the (somewhat higher) standard-of-need amount. Even then, the offset is limited to the excess of familial receipts over the standard of need. See Doucette, 947 F.2d at 23-24. ___ ________ In 1991, Maine, faced with burgeoning budgetary woes, narrowed this gap by upgrading basic AFDC grants while simultaneously downgrading standards of need. This revision took effect on April 1, 1992 (after the district court lifted a temporary stay). As a result, AFDC-eligible families with relatively high amounts of supplemental income receive lower payments than before and families with little or no supplemental income receive higher payments than before. More specifically, because child support payments are collected by the state and then transmitted to AFDC recipients as supplemental income, see ___ 3 42 U.S.C. 602(a)(2) (1988), Maine's reduction in the standard of need meant that certain AFDC-eligible families would receive lower overall payments from the state than they would have _______ received prior to May 1, 1988.1 After the changes became effective, the Secretary continued to authorize Medicaid funding for Maine. Although the revisions did not ruffle federal feathers, they prompted the instant suit. Seeking declaratory and injunctive relief, 5 U.S.C. 702 (1988), plaintiff-appellant Christine Stowell accused the Secretary of violating a maintenance-of-effort provision contained in the Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, 102 Stat. 683.2 That provision, codified at 42 U.S.C. 1396a(c)(1) ____________________ 1A concrete example may help to illuminate the effect of the revisions. On May 1, 1988, a single mother with two dependent children would have received a basic AFDC grant of $416. Had the family unit also received $157 in child support payments, it would have retained the entire amount ($573 per month). While Maine's revisions boosted the same family's basic AFDC grant to $453 per month, the concomitant lowering of the standard of need, given the assumptions in our hypothetical, would have required an offset of all supplemental income over $100 per month, or $57. The net effect, then, would have been to cap the family's total monthly receipts at $553 ($20 per month less than the family would have retained under the earlier regime). On the other hand, if our hypothetical family had no supplemental income, the revisions would have increased its receipts by $37 per month (the amount by which Maine hiked the basic AFDC grant). In constructing this example, we have excluded any reference to the $50 "pass-through" payment described in 42 U.S.C. 657(b)(1) (1988), which was unaffected by the revisions in question. 2Stowell also attempted to sue the state. That suit has gone by the boards as a result of our holding that the maintenance-of-effort provision imposed a duty only on the Secretary. See Stowell v. Ives, 976 F.2d 65, 71 (1st Cir. 1992). ___ _______ ____ 4 (1988), directs the Secretary not to approve any state's Medicaid plan if the state's AFDC program sets "payment levels" lower than those in effect on May 1, 1988. Refined to bare essence, Stowell's position has consistently been that the maintenance-of- effort provision prohibits the Secretary from approving state Medicaid plans if the state's AFDC payment levels are lower than those in effect on May 1, 1988; that the total amount of money Stowell and persons similarly situated currently receive from Maine is lower than the amount they would have received under the earlier (pre-May 1, 1988) rules; that, nonetheless, the Secretary did not refuse to fund Maine's Medicaid plan; and that, therefore, the Secretary violated the maintenance-of-effort provision. The case proceeded as a class action3 and the parties submitted it on a stipulated record. The district court asked a magistrate judge for a report and recommendation. Reasoning that Maine had not, in fact, reduced its payment levels below those in ____________________ 3The plaintiff class comprises: All families in the State of Maine who would be eligible for AFDC benefits and/or supplemental payments under 42 U.S.C 602(a)(28) [providing for payment of child support collected by the state] under the AFDC payment levels in effect in Maine on May 1, 1988 and who would receive a smaller total AFDC plus supplemental 602(a)(28) payment under the AFDC payment levels proposed to be effective April 1, 1992 than they would have received under the May 1, 1988 payment levels. Stowell v. Sullivan, 812 F. Supp. 264, 266 n.3 (D. Me. 1993). _______ ________ 5 effect on May 1, 1988, the magistrate recommended that the court enter judgment for the Secretary. See Stowell v. Sullivan, 812 ___ _______ ________ F. Supp. 264, 266-71 (D. Me. 1993) (reproducing magistrate's report). On de novo review, the court adopted the __ ____ recommendation. See id. at 265-66. Plaintiffs appeal. ___ ___ II. ANALYSIS II. ANALYSIS The issue is whether the Secretary's continued funding of Maine's Medicaid plan, despite the state's decision to lower its standard of need, violates the maintenance-of-effort provision.4 We have repeatedly urged that, when a nisi prius ____ _____ court handles a matter appropriately and articulates a sound basis for its ruling, "a reviewing tribunal should hesitate to wax longiloquent simply to hear its own words resonate." In re _____ San Juan Dupont Plaza Hotel Fire Litig., 989 F.2d 36, 38 (1st _________________________________________ Cir. 1993). Because we are in substantial agreement with Magistrate Judge Cohen's thoughtful disquisition, see Stowell v. ___ _______ Sullivan, 812 F. Supp. at 266-71, we invoke this principle and ________ confine ourselves to a few decurtate observations. First: Whenever a court is charged with statutory First: _____ interpretation, the text of the statute must be its starting point. See Estate of Cowart v. Nicklos Drilling Co., 112 S. Ct. ___ ________________ ____________________ 2589, 2594 (1992). Here, however, the statutory language does ____________________ 4The Secretary also argues that, even if the term "payment levels" is given the expansive reading that appellants suggest, the federal government's obligation to intervene would not arise unless and until Maine sought approval of amendments to its Medicaid plan. We need not consider this contention and, consequently, take no view of it. 6 not directly answer the question posed. It provides that: the Secretary shall not approve any State plan for medical assistance if (1) The State has in effect, under its [AFDC plan], payment levels that are less than the payment levels in effect under such plan on May 1, 1988. 42 U.S.C. 1396a(c)(1). The term "payment levels," which is not defined elsewhere in the statute, could, as the Secretary claims, refer to the stipendiary amounts of basic AFDC grants; it could also, as appellants claim, refer to total income, that is, grant amounts plus supplemental income actually received. Given two plausible alternatives, and recognizing that the universe of interpretive possibilities may extend beyond them, we think the statute contains an undeniable ambiguity. Appellants resist this conclusion. Pointing out that, in certain other contexts, Congress referred to the basic AFDC grant as the "payment standard," 42 U.S.C. 602(h) (1988), they argue that the term "payment levels" must mean something else. This argument founders. It is apodictic that Congress may choose to give a single phrase different meanings in different parts of the same statute. See Atlantic Cleaners & Dyers, Inc. v. United ___ _______________________________ ______ States, 286 U.S. 427, 433 (1932); Greenwood Trust Co. v. ______ _____________________ Massachusetts, 971 F.2d 818, 830 n.10 (1st Cir. 1992), cert. _____________ _____ denied, 113 S. Ct. 974 (1993). It is a natural corollary of this ______ truism that Congress, in its wisdom, may choose to express the same idea in many different ways. Cf., e.g., Cowart, 112 S. Ct. ___ ____ ______ at 2596 (stating that Congress's eschewal of a term of art used 7 elsewhere in the same statute, in favor of a more descriptive term, does not necessarily mean that the two terms bear different meanings). Any other interpretive rule would defy human nature and ignore common practice. Courts should go very slowly in assigning talismanic importance to particular words or phrases absent some cogent evidence of legislative intent. Second: Appellants' attempt to score a touchdown by a Second: ______ selective perusal of legislative history puts no points on the board. The centerpiece of this effort is a passage evincing a congressional purpose "to assure that the resources [for Medicaid-related coverage of certain persons] are not diverted from the [AFDC] program." House Conf. Rep. No. 661, 100th Cong., 2d Sess. 145, 256, reprinted in 1988 U.S.C.C.A.N. 923, 1034. But _________ __ this language does not help to resolve the statute's linguistic ambiguity in appellants' favor. For one thing, the passage, like the statute itself, leaves unaddressed the question whether Congress's underlying concern lay with all payments affecting the AFDC program or only with the stipendiary amounts of basic AFDC grants and an ambiguous statute cannot be demystified by resort to equally ambiguous legislative history. For another thing, to the extent, if at all, that the quoted passage indicates a broad congressional purpose to provide AFDC recipients with a fixed _____ safety net, we think it cuts against appellants' construction of the term "payment levels." Because supplemental income is contingent on a nearly infinite variety of circumstances, 8 appellants' definition would at most guarantee AFDC recipients a hypothetical sum; the Secretary's reading, on the other hand, secures a fixed payment floor. The sockdolager is that the quoted passage, read in context, is counteracted by other items in the legislative history, including those that stress the importance of continued flexibility. Congress prized flexibility because it "allows each state to establish its own need and payment standards for assistance." S. Rep. No. 377, 100th Cong., 2d Sess. 1, 49, reprinted in 1988 U.S.C.C.A.N. 2776, 2826. Certainly, the _________ __ Secretary's rendition of "payment levels" enhances a state's flexibility while appellants' version detracts from it. See ___ infra pp. 13-14. This jousting between archival excerpts drives _____ home the point that "reviewing legislative history is like looking over the crowd at a party and picking out one's friends." Patricia J. Wald, Some Observations on the Use of Legislative ______________________________________________ History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 214 _______________________________________ (1983) (quoting Leventhal, J.). In this instance, both sides have unearthed congenial acquaintances. The net result, however, is that evidence gleaned from the legislative history does not tell a straightforward tale and, therefore, does not resolve the ambiguity with which we are concerned.5 ____________________ 5By discussing the House Conference Report excerpt, we do not mean to imply that Maine has diverted resources from the AFDC program to the Medicaid program. There is no such evidence in the record. Thus, appellants' reading of the legislative history, even if we were to credit it, would not necessarily carry the day. See, e.g., Babbitt v. Michigan, 778 F. Supp. 941, ___ ____ _______ ________ 947 (W.D. Mich. 1991). 9 Third: When a statute is silent with respect to a Third: _____ specific question, courts frequently afford deference to a plausible construction offered by the agency charged with administering it. See National R.R. Passenger Corp. v. Boston & ___ _____________________________ ________ Me. Corp., 112 S. Ct. 1394, 1401 (1992) (stating that "[i]f the _________ agency interpretation is not in conflict with the plain language of the statute, deference is due"); Chevron U.S.A., Inc. v. NRDC, ____________________ _____ Inc., 467 U.S. 837, 843 (1984); Massachusetts Dep't of Educ. v. ____ _____________________________ United States Dep't of Educ., 837 F.2d 536, 541 (1st Cir. 1988). ____________________________ Here, the agency that the Secretary heads, the Department of Health and Human Services (HHS), is entrusted with administering both the Medicaid and AFDC statutes. Since HHS interprets the maintenance-of-effort provision to refer only to the basic AFDC grant, Chevron principles pose a formidable barrier in _______ appellants' path. In an endeavor to skirt this barrier, appellants suggest that deference would be inappropriate here because HHS has not maintained a consistent position. The suggestion is factually unfounded and legally unpersuasive. We begin by examining the facts. Although the agency's position has shifted in some respects over the years, it has not waffled with regard to the meaning of "payment levels." HHS's first public elucidation of the point appears in a 1989 publication informing state officials that "if you make adjustments to your [AFDC] payment levels which do not result in lower payment amounts being made to families with no countable 10 income, you are considered to meet the Medicaid Maintenance of Effort Requirements." State Medicaid Manual 3205 (May 1989). In subsequent commentaries, HHS made plain that this reference was intended to include only those families which received no income over and above the basic AFDC grant. We see no inconsistency between this original interpretation, roughly contemporaneous with the statute's enactment, and the agency's current views. Appellants' legal theory rests on an equally shaky foundation. Agencies "must be given ample latitude to adapt [their] rules and policies to the demands of changing circumstances." Rust v. Sullivan, 111 S. Ct. 1759, 1769 (1991) ____ ________ (citations and internal quotation marks omitted). An important corollary of this rule is that an agency's position may evolve over a period of time without automatically forfeiting all claims to judicial deference. And, moreover, an agency interpretation that represents a modification of, or even a sharp departure from, a prior interpretation does not necessarily eliminate the expertise-related reasons for judicial deference. See id.; ___ ___ Chevron, 467 U.S. at 862-64. Thus, an explained modification of _______ an agency interpretation ordinarily retains its entitlement to whatever deference may be due. See Rust, 111 S. Ct. at 1769 ___ ____ (collecting cases). So it is here.6 ____________________ 6To be sure, in this case the agency claims that its position has been consistent throughout. It is too much to expect that even bureaucrats a species renowned for mastery of the fissilingual can explicate the reasons underlying a change that was never made. Regardless, HHS has explained, cogently and 11 Next, appellants try to skirt the Chevron barrier by _______ taking a different path. They asseverate that HHS's view merits little deference because determining this particular statute's meaning involves primarily judicial, as opposed to administrative, skills. The attempted end run fails. The Chevron doctrine often requires different degrees _______ of deference in different situations. See Sierra Club v. Larson, ___ ___________ ______ ___ F.2d ___, ___ (1st Cir. 1993) [No. 92-2227, slip op. at 17- 18]. Although the need for deference diminishes as issues become more law-bound and less moored to administrative expertise, see, ___ e.g., United States v. 29 Cartons of * * * an Article of Food, ____ _____________ ________________________________________ 987 F.2d 33, 38 (1st Cir. 1993) (collecting cases), this case is not removed from the realm of specialized administrative knowledge. When Congress commanded the Secretary to ensure that "payment levels" were maintained, it left open the question of how that term might be defined in a manner that would best promote efficient, fair administration of two complicated social service programs. The agency, in filling this lacuna, relied on its lengthy experience with the statutes involved. See AFDC ___ Information Memorandum (August 5, 1992). Courts should not cavalierly discount the value of agency expertise painstakingly garnered in the administration, over time, of programs of remarkable intricacy. See, e.g., La Casa Del Convaleciente v. ___ ____ __________________________ ____________________ in detail, why it believes its current interpretation of the ambiguous phrase is sound. No more is exigible. See Rust, 111 ___ ____ S. Ct. at 1769; Motor Vehicle Mfrs. Ass'n v. State Farm Mut. __________________________ ________________ Auto. Ins. Co., 463 U.S. 29, 42 (1983). ______________ 12 Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992) (suggesting that ________ deference to agency expertise is particularly appropriate in the complex field of Medicare); Wilcox v. Ives, 864 F.2d 915, 926-27 ______ ____ (1st Cir. 1988) (Breyer, J., concurring) (suggesting that deference is appropriate where an agency has, through its daily experience in administering a statute, gained a firm understanding of the relation of a given provision to the statute as a whole); see also Friedman v. Berger, 547 F.2d 724, 727 n.7 ___ ____ ________ ______ (2d Cir. 1976) (Friendly, J.) (stating that the Social Security Act, of which AFDC and Medicaid are a part, is "almost unintelligible to the uninitiated"), cert. denied, 430 U.S. 984 _____ ______ (1977). Fourth: Our last point is, in actuality, a subset of Fourth: ______ our third point. In this instance, reading the phrase "payment levels" as encompassing only the stipendiary amounts of basic AFDC grants preserves the program's flexibility and facilitates its administration. Hence, the cardinal reason why deference is due is because the agency's interpretation of the disputed term is not only linguistically plausible but also eminently sensible. See 29 Cartons, 987 F.2d at 38 (explaining that the true measure ___ __________ of a court's willingness to defer may depend, in the final analysis, on the persuasiveness of the agency's interpretation, given all the attendant circumstances); Mass. Dep't of Educ., 837 ____________________ F.2d at 541 (similar). States have traditionally been afforded a broad measure of discretion in implementing the AFDC program. See Jefferson v. ___ _________ 13 Hackney, 406 U.S. 535, 539-41 (1972). The murky language of 42 _______ U.S.C. 1396a(c)(1) cannot readily be interpreted as a signal that Congress meant to scrap this tradition. Cf., e.g., Rosado ___ ____ ______ v. Wyman, 397 U.S. 397, 414 n.17 (1970) ("An extensive alteration _____ in the basic underlying structure of an established program is not to be inferred from ambiguous language that is not clarified by legislative history."). Appellants' construction that the maintenance-of-effort provision is triggered whenever any family unit receives fewer total dollars in a given month than it would have received that month under the set of computational rules that were in effect on May 1, 1988 runs at cross purposes to this deep-seated discretion by inhibiting a state's ability to reorder its priorities. For example, reading the term "payment levels" as appellants prefer would preclude a state from distributing AFDC funds according to a new formula, although the state maintained (or, perhaps, even increased) its aggregate AFDC expenditures.7 In contrast, interpreting the term "payment levels" as referring only to basic AFDC grants, as the Secretary urges, provides all recipients a protective floor while still permitting states to implement changes that more efficiently allocate scarce resources. There is every reason to believe that this latter route, which preserves the discretion traditionally ____________________ 7The case at bar illustrates the point. Although Maine reduced the amount of outside income a person may receive before AFDC payments will be offset partially to save money, it also had another purpose: increasing the benefits available to more needy AFDC recipients, i.e., those who receive basic AFDC grants but ____ have little or no supplemental income. 14 available to the states in implementing the AFDC program and maximizes state flexibility, is a far closer approximation of congressional intent. See S. Rep. No. 377, 100th Cong., 2d Sess. ___ 49, reprinted in 1988 U.S.C.C.A.N. 2776, 2826 (referring to the _________ __ incidence of state flexibility in connection with need and payment standards). Nor is this the only straw in the interpretive breeze. We can safely assume that Congress, in enacting the statute, preferred administrative efficiency to administrative clutter. See Dion v. Commissioner, Me. Dep't of Human Servs., 933 F.2d 13, ___ ____ _______________________________________ 17 (1st Cir. 1991) (discussing congressional interest in an administratively streamlined procedure for food stamp recipients). This, too, cuts in favor of the Secretary for the Secretary's interpretation is administratively more workable than appellants' interpretation. If the term "payment levels" means basic AFDC grant amounts, both state and federal administrators can tell quite easily whether a proposed change in a state's plan activates the maintenance-of-effort provision. If, on the other hand, the term means all payments made to all AFDC recipients, it prescribes a much more complicated, highly individualized calculation. Because the Secretary's reading of the statute ensures that a significant portion of the finite funds available for AFDC and Medicaid go to needy recipients rather than to the costs of administrative implementation, it jibes more neatly with Congress's likely intent. III. CONCLUSION III. CONCLUSION 15 We need go no further.8 When, as now, the case is debatable, the key phrase in the statute is patently ambiguous, the legislative history is unilluminating, the subject matter is somewhat technical, and the indications are that Congress wanted to take advantage of agency expertise, a plausible interpretation of the disputed term, expressed with clarity by the agency charged with the statute's administration, necessarily carries great weight. To clinch matters, the agency's interpretation of the phrase "payment levels" in the statute sub judice also helps ___ ______ to maintain traditional programmatic goals and to promote the public interest in efficient implementation of the affected programs. We hold, therefore, consistent with the Secretary's view, that the allusion in 42 U.S.C. 1396a(c)(1) to "payment levels" refers only to the stipendiary amounts of basic AFDC grants and not, as appellants have argued, to total monies actually received by each AFDC family. Accordingly, the judgment below will be Affirmed. Affirmed. ________ ____________________ 8We do not tarry over appellants' assertion that administrative interpretations and statutory provisions in other fields treat certain supplemental income in the same fashion as basic AFDC grants. In the first place, these interpretations, all of which deal with program administration, are analytically distinct and, therefore, inapposite. See Stowell v. Sullivan, ___ _______ ________ 812 F. Supp. at 270-71 (discussing identical proffer). In the second place, this is a zero-sum game; the Secretary has produced a counter-list of interpretations and provisions which treat supplemental income and basic AFDC grants differently. Compare, _______ e.g., 51 Fed. Reg. 29,223, 29,224 (1986) (declaring supplemental ____ payments to be AFDC expenditures for purposes of matching federal funds) with, e.g., Winslow v. Commissioner, Me. Dept. of Human ____ ____ _______ __________________________________ Servs., 795 F. Supp. 47, 49-50 (D. Me. 1992) (upholding ______ Secretary's determination that supplemental payments are not AFDC payments for purposes of computing Medicaid income levels). 16