UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1783

NANCY STRICKLAND, ET AL.,
Plaintiffs, Appellees,

v.

COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES,
Defendant, Appellee,

v.

SECRETARY, U.S. DEPARTMENT OF AGRICULTURE,
Third-Party Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Stahl, Circuit Judge.

Jennifer H. Zacks, Attorney, Civil Division, Dept. of
Justice, with whom Frank W. Hunger, Assistant Attorney General,
Mark B. Stern, Attorney, Civil Division, Dept. of Justice, and
Jay P. McCloskey, United States Attorney, were on brief, for
appellant.
Rufus E. Brown, with whom Jack Comart, Pat Ende, and Pine
Tree Legal Assistance were on brief, for appellees.

February 16, 1995


SELYA, Circuit Judge. This suit questions the validity SELYA, Circuit Judge.

of a regulation promulgated by the Secretary of Agriculture in

connection with his management of the Food Stamp Act, 7 U.S.C.

2011-2025 (1988) (the Act). Answering the question requires us

to explore the frontiers of Chevron deference. See Chevron

U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S.

837 (1984). Because we believe that proper respect for the

Secretary's interpretation of the applicable statute validates

the regulation, we reverse the district court's order barring its

enforcement.

I. I.

Background Background

A A

The Food Stamp Act The Food Stamp Act

The Act harks back to 1964. Congress passed it "to

safeguard the health and well-being of the Nation's population by

raising levels of nutrition among low-income households." 7

U.S.C. 2011. The Act creates a federally funded, but state

administered, program designed to distribute food stamps

according to income and family size. The recipient can use these

stamps to purchase food at local markets. Participating

retailers accept the stamps as if they were cash, for the

government redeems them at face value. The Secretary of

Agriculture is charged with overseeing the federal aspects of the

food stamp program. See id. at 2013. Agencies selected by the

several states administer the state aspects of the program. The

2

Department ofHuman Services (DHS) performs thisfunction in Maine.

Congress originally restricted eligibility for food

stamps to families of limited means but made no attempt to define

income (leaving that chore to the states). In 1971, Congress

directed the Secretary to establish uniform standards of

eligibility. The Secretary then promulgated regulations that

defined net income as gross income less "the cost of producing

that income," but excluded depreciation as a component of this

deduction. See 36 Fed. Reg. 14102, 14107 (July 29, 1971)

(enacting former 7 C.F.R. 273.1(c)(1)(b)).

In 1977, Congress retrofitted the Act. In a

comprehensive, detailed revision of the statute, Congress

specified that, for purposes of program eligibility, income was

not to include the "cost of producing self-employed income." 7

U.S.C. 2014(d)(9). Although the 1977 amendments did not define

the term "cost," the House Committee on Agriculture reported that

"the Department would be expected to revise its regulations in

this regard to allow some form of depreciation in arriving at

`net' business income." H.R. Rep. No. 464, 95 Cong., 1st Sess.

25 (1977), reprinted in 1977 U.S.C.C.A.N. 1978, 2001-02. The

Secretary revisited the topic in 1978 and promulgated regulations

allowing depreciation as a cost in calculating self-employment

income. See 43 Fed. Reg. 47846, 47912 (Oct. 17, 1978).

In 1980, a report produced by a joint House-Senate

conference committee muddied the waters. The conference

committee report accompanied the Food Stamp Act Amendments of

3

1980 (the FSAA), Pub. L. No. 96-249, 94 Stat. 357 (1980), which,

among other things, decreased the aggregate value of non-

excludable assets that a family might own while retaining food

stamp eligibility. The report memorialized the conferees'

"inten[tion] that the Secretary no longer permit depreciation to

be subtracted in determining net self-employment income." H.R.

Conf. Rep. No. 957, 96th Cong., 2d Sess. 29 (1980), reprinted in

1980 U.S.C.C.A.N. 1057, 1070. Despite this statement of

congressional intent, however, the FSAA made no change in the

text of the statutory provision that allowed a deduction for the

"cost of producing self-employed income," 7 U.S.C. 2014(d)(9).

Hard on the heels of this conference committee report,

the Secretary proposed regulations aimed at eliminating

depreciation from the computation of the cost of producing self-

employment income. In the proposal, the Secretary stated:

The regulations implementing the 1977 Act
included a provision allowing depreciation as
a cost of doing business for self-employed
households ( 273.11(a)(4)(ii)). This was
done in compliance with the legislative
history, H.R. Rep. No. 95-464, p.25. The
Conference Report accompanying the 1980
Amendments suggests that the Secretary delete
depreciation, H.R. Rep. No. 96-957, p.29.
Allowing such costs when determining net
self-employment income results in an
exemption of amounts not constituting "actual
costs" to the household; households are, in a
sense, given a deduction in advance for the
cost of capital goods which is otherwise not
allowed. Appropriate changes are being
proposed to 273.11(a) to correspond to the
Conference Report's suggestion.

46 Fed. Reg. 4642, 4646 (Jan. 16, 1981). The final regulation, 7

C.F.R. 273.11(a)(4)(ii) (1994), mimicked the proposal and

4

instructed the states to disregard depreciation in calculating

net self-employment income.

B B

The Litigation The Litigation

Nancy and Lyle Strickland reside in Belgrade, Maine.

They ran a successful construction business until 1990, when the

recession forced them to downsize. Although they remained in

business, their profits dwindled. At about this time, they

applied for, and were granted, food stamp assistance. On their

1992 federal tax return, they reported a business loss of $4,686,

largely due to claimed depreciation ($24,380) on construction

equipment.1 In 1993, the DHS informed the Stricklands that they

would no longer receive food stamps because, based on their tax

return, they had annual self-employment income, without regard to

depreciation, of $19,694. This equalled net income of $1,641.16

per month more than twice the food stamp eligibility limit for

a two-person household. See Stipulated Record at 5 (confirming

that the eligibility ceiling for the relevant period is $766 per

month); see generally 7 C.F.R. 273.9 (1994) (linking income

standards to the federal poverty level).

Disappointed by the finding of ineligibility, the

Stricklands sued DHS in Maine's federal district court. They

challenged the Secretary's amended regulation, 7 C.F.R.


1The Stricklands say that they could not sell their
construction equipment because they would no longer have any
means of producing income. They acknowledge, however, that they
owed more on some pieces of equipment than those pieces were
likely to bring on the open market.

5

273.11(a)(4)(ii) (1994), which excluded depreciation on business

equipment from the allowable "costs of doing business" in

determining a household's eligibility for food stamps, as

offensive to the mandate of 7 U.S.C. 2014(d)(9). DHS filed a

third-party complaint against the Secretary of Agriculture. The

plaintiffs then obtained leave to amend, and asserted claims

directly against the Secretary.2 The parties stipulated to the

relevant facts and the district court certified the Stricklands

as representatives of a class comprising all Maine food stamp

applicants or recipients adversely affected by the amended

regulation on or after July 1, 1992.

On April 8, 1994, the court granted the plaintiffs'

motion for judgment on the stipulated record. See Strickland v.

Commissioner, 849 F. Supp. 818 (D. Me. 1994). The court framed

the decisive legal issue in the following way: "Can Congress

change the law, simply by directing that it be so in legislative

history, without amending the pertinent statutory language?" Id.

at 818. Judge Hornby answered this loaded question in the

negative. He then ruled that the amended regulation could not

stand because the Secretary had promulgated it in response to a

perceived congressional directive, not embodied in a duly enacted

statute, rather than in the authentic exercise of administrative

discretion. See id. at 820. The Secretary now appeals.



2From and after the time that the Secretary answered the
plaintiff's first amended complaint, he has pulled the laboring
oar in defending the regulation.

6

II. II.

Applicable Legal Principles Applicable Legal Principles

A A

Standard of Review Standard of Review

Interpreting a statute or a regulation presents a

purely legal question subject to de novo review. See McCarthy v.

Azure, 22 F.3d 351, 354 (1st Cir. 1994); Liberty Mut. Ins. Co. v.

Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992).

Nevertheless, the availability of plenary judicial review "does

not obviate the devoir of persuasion in a food stamp case in

which a plaintiff challenges the validity of the regulatory

mosaic." Massachusetts v. Secretary of Agric., 984 F.2d 514, 521

(1st Cir.), cert. denied, 114 S. Ct. 81 (1993). An inquiring

court even a court empowered to conduct de novo review must

examine the Secretary's interpretation of the statute, as

expressed in the regulation, through a deferential glass. See

id.

B B

The Chevron Doctrine The Chevron Doctrine

Judicial review of an agency's construction of a

statute that it administers involves two separate but

interrelated questions, only the second of which furnishes an

occasion for deference:

First, always, is the question whether
Congress has directly spoken to the precise
question at issue. If the intent of Congress
is clear, that is the end of the matter; for
the court, as well as the agency, must give
effect to the unambiguously expressed intent

7

of Congress. If, however, the court
determines Congress has not directly
addressed the precise question at issue, the
court does not simply impose its own
construction on the statute, as would be
necessary in the absence of an administrative
interpretation. Rather, if the statute is
silent or ambiguous with respect to the
specific issue, the question for the court is
whether the agency's answer is based on a
permissible construction of the statute.

Chevron, 467 U.S. at 842-43 (footnotes omitted).

In performing the first part of a Chevron analysis, no

deference is due. Instead, courts must look primarily to the

plain meaning of the statute, drawing its essence from the

"particular statutory language at issue, as well as the language

and design of the statute as a whole." K Mart Corp. v. Cartier,

Inc., 486 U.S. 281, 291 (1988); accord Dunn v. Secretary of

Agric., 921 F.2d 365, 366-67 (1st Cir. 1990). Beyond this point,

it remains unclear whether, and if so, to what extent, a court

engaged in the first stage of a Chevron inquiry may use other

tools of statutory construction, such as legislative history, in

searching for Congress' unambiguously expressed intent on a

particular issue. See Dunn, 921 F.2d at 367 n.2 (citing

conflicting cases but not resolving the point).

Legislative history is subject to many and varied

criticisms, and the uncertainty about its value in general

parallels the uncertainty about its value in relation to the

Chevron doctrine.3 Respectable authority indicates that it is


3Critics say, for example, that legislative history is
written by staffers rather than by Congress itself; that it is
easily manipulated; that it complicates the tasks of execution

8

appropriate to employ all the "traditional tools of statutory

construction" in the first part of the Chevron analysis when the

statutory language itself is not dispositive. See INS v.

Cardoza-Fonseca, 480 U.S. 421, 432-43, 446 (1987) (examining

legislative history to confirm the validity of an interpretation

suggested by the statute's language) (dictum); Massachusetts v.

Lyng, 893 F.2d 424, 429 (1st Cir. 1990). But there is also

respectable support for the proposition that the Chevron

analysis, in its initial phase, does not look beyond the

statutory text. See, e.g., National R.R. Passenger Corp. v.

Boston & Me. Corp., 112 S. Ct. 1394, 1401 (1992) (stating that

deference is due so long as "the agency interpretation is not in

conflict with the plain language of the statute"); K Mart Corp.,

486 U.S. at 292 ("If the agency regulation is not in conflict

with the plain language of the statute, a reviewing court must

give deference to the agency's interpretation of the statute.");

NLRB v. United Food & Commercial Workers Union, 484 U.S. 112,

133-34 (1987) (Scalia, J., concurring) (criticizing dictum in

Cardoza-Fonseca); Stowell v. Secretary of HHS, 3 F.3d 539, 543

(1st Cir. 1993) (approving deference where "statute is silent

with respect to a specific question").



and obedience; and that it often is shaped by members of Congress
who cannot achieve passage of a desired interpretation in the
actual text of an enacted statute. See Matter of Sinclair, 870
F.2d 1340, 1342-44 (7th Cir. 1989); see also Stephen Breyer, On
the Uses of Legislative History in Interpreting Statutes, 65 S.
Cal. L. Rev. 845, 845-47 (1991) (describing various attacks on
legislative history, but defending its use when judges are faced
with unclear statutory language).

9

We think that the difference between these two views

may, as a practical matter, be more apparent than real.4 In any

event, we do not find the legislative history in this case

determinative. Thus, we need not precisely define the function,

if any, of legislative history under Chevron. Rather, we assume

arguendo, but do not decide, that an inquiring court may look in

that direction during the initial stage of a Chevron inquiry.

On this assumption, the question whether Congress has

spoken on a particular question involves two smaller steps. We

look first to the statute's language. If the text, given its

plain meaning, answers the interpretive question, the language

must prevail and further inquiry is foreclosed. If no such

readily apparent meaning springs from the statute's text, we next

examine the legislative history, albeit skeptically, in search of

an unmistakable expression of congressional intent. And if, at

that stage, the statute itself, viewed in connection with the

statutory design and the legislative history, reveals an

unequivocal answer to the interpretive question, the court's

inquiry ends.

Thus, it is only when a court cannot discern an

unmistakably clear expression of congressional intent that the

Chevron inquiry moves into its second stage. Until then,



4Courts that exclude legislative history during the first
stage of the Chevron analysis may well decide to consider it
during the second stage in order to determine whether the
agency's interpretation is a permissible one. Thus, compelling
legislative history probably will preclude a contrary agency
position under either of the two views of Chevron.

10

deference is not a consideration but from that point forward,

deference looms large. The court must examine the agency's

interpretation to see how it relates to the statute. This

examination involves a high degree of respect for the agency's

role. The agency need not write a rule that serves the statute

in the best or most logical manner; it need only write a rule

that flows rationally from a permissible construction of the

statute. See, e.g., Cohen v. Brown Univ., 991 F.2d 888, 899 (1st

Cir. 1993) (noting that it is unimportant to the Chevron analysis

whether the court, if writing on a pristine page, would prescribe

a different version of the regulation). In other words, an

agency's interpretive regulations must stand "unless they are

arbitrary, capricious, or manifestly contrary to the statute."

Chevron, 467 U.S. at 844.

To be sure, the Chevron doctrine has a protean quality.

Under it, courts afford varying degrees of deference to agency

interpretations in varying circumstances. See Stowell, 3 F.3d at

544; Sierra Club v. Larson, 2 F.3d 462, 468-69 (1st Cir. 1993).

To cite an example that possesses particular pertinence for

present purposes, deference is "particularly appropriate in

complex and highly specialized areas where the regulatory net has

been intricately woven." Massachusetts Dep't of Educ. v. United

States Dep't of Educ., 837 F.2d 536, 541 (1st Cir. 1988) (quoting

Citizens Sav. Bank v. Bell, 605 F. Supp. 1033, 1042 (D.R.I.

1985)). Accordingly, "[m]atters of accounting, unless they be

the expression of a whim rather than an exercise of judgment, are

11

for the agency." Id. (quoting Cheshire Hosp. v. New Hampshire-

Vt. Hospitalization Serv., Inc., 689 F.2d 1112, 1117 (1st Cir.

1982)); accord American Tel. & Tel. Co. v. United States, 299

U.S. 232, 236-37 (1936).

Ultimately, of course, deference depends on the

persuasiveness of the agency's position. See, e.g., United

States v. 29 Cartons of *** An Article of Food, 987 F.2d 33, 38

(1st Cir. 1993). Furthermore, an administrative agency's

entitlement to deference is not limited to its initial

interpretation of a statute. Agencies "must be given ample

latitude to adapt [their] rules and policies to the demands of

changing circumstances." Rust v. Sullivan, 500 U.S. 173, 187

(1991) (citations and internal quotation marks omitted).

Consequently, an explained modification, even one that represents

a sharp departure from a longstanding prior interpretation,

ordinarily retains whatever deference is due. See id. at 186-87;

Stowell, 3 F.3d at 544.

C C

Taming the Oxymoron Taming the Oxymoron

"Subsequent legislative history" is, as others have

noted, see, e.g., Continental Can Co. v. Chicago Truck Drivers,

916 F.2d 1154, 1157 (7th Cir. 1990), an oxymoron. What is more,

the hazards inherent in virtually all legislative history are

magnified when congressional materials are created after the

fact, and the views of a subsequent Congress are imputed to the

earlier Congress that enacted a given statute. See Consumer

12

Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 117

(1980); United States v. Price, 361 U.S. 304, 313 (1960).

Despite these problems, however, such materials occasionally have

been found useful in decrypting an unclear statute. See, e.g.,

Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596

(1980); United States v. Ven-Fuel, Inc., 758 F.2d 741, 758-59

(1st Cir. 1985). We conclude that the value, if any, of such

post-enactment materials should be decided case by case, see

Liberty Mut. Ins. Co., 978 F.2d at 755 n.7, but should always be

ingested with a healthy dose of skepticism.

Finally, in evaluating an agency's response to

subsequent comments by Congress, we must keep in mind not only

the dubious value of such comments, but also two overarching

constitutional principles. First, Congress cannot dictate the

interpretation of a statute by a subsequent expression of one of

its committees (even, as here, a joint conference committee); "it

is the function of the courts and not the Legislature . . . to

say what an enacted statute means." Pierce v. Underwood, 487

U.S. 552, 566 (1988). Second, and relatedly, Congress cannot

amend a statute merely by inserting the proposed change in a

congressional report (even in a report of a joint conference

committee); the amendment must meet the various constitutional

benchmarks, including bicameral passage and presentment to the

President. See U.S. Const. art I; see also INS v. Chadha, 462

U.S. 919, 944-51 (1983).

III. III.

13

Analysis Analysis

A A

Stage One Stage One

Consistent with the methodology we have outlined, we

begin by examining the plain language of 7 U.S.C. 2014(d)(9) to

determine if it speaks definitively to the necessity of including

depreciation as a "cost" of producing self-employment income. We

think it does not. Like many words, "cost" has more than a

single, unitary meaning. While the plaintiffs proffer opinion

evidence from an economist and an accountant to the effect that

certain professional disciplines routinely calculate depreciation

as a "cost" of producing income, that is only half the story;

common sense argues that the word "cost" may also legitimately be

restricted to cash outlays made in a given period to produce

income. At bottom, then, the word "cost" is a chameleon, capable

of taking on different meanings, and shades of meaning, depending

on the subject matter and the circumstances of each particular

usage. See 20 C.J.S. Cost (1940) (stating flatly that "[t]he

term [cost] is one of equivocal meaning"). And among its varying

constructions, "cost" assuredly can mean the price of, or the

amount that must immediately be expended to purchase, an item.

See, e.g., Webster's Third New International Dictionary 515

(1986) (defining "cost" in its primary sense as signifying "the

amount or equivalent paid or given or charged or engaged to be

paid or given for anything bought or taken in barter or for

service rendered: CHARGE, PRICE"); Black's Law Dictionary 312

14

(5th ed. 1979) (defining "cost" as "Expense; price. The sum or

equivalent expended, paid or charged for something."); Funk &

Wagnalls New Standard Dictionary of the English Language 591

(1934) (defining "cost" as "[t]hat which has to be given for a

thing in order to procure it; especially, the price paid; outlay

of any kind; expense").

In these circumstances, a credible argument can be made

that, as between two plausible meanings, a reader should give the

word "cost" its ordinary meaning as opposed to the more

specialized meaning preferred by accountants or economists. See

Perrin v. United States, 444 U.S. 37, 42 (1979) (recognizing that

undefined words in a statute ordinarily should "be interpreted as

taking their ordinary, contemporary, common meaning"); United

States v. Holmquist, 36 F.3d 154, 159 (1st Cir. 1994) (same),

petition for cert. filed (U.S. Dec. 27, 1994) (No. 94-7485). We

need not go that far, however; it suffices to say that "cost" in

this context can naturally be read as excluding depreciation on

capital goods.

Since the statutory language does not resolve the

issue, we must consult other sources for guidance as to whether

Congress has spoken plainly on the question sub judice. The

Stricklands asseverate that the legislative history of section

2014(d)(9) adds the requisite clarity. We do not agree. The

lone reference to the subject in the House report accompanying

the 1977 revamping of the Act, heralded by the plaintiffs as the

linchpin of their asseveration, comprises but one paragraph in

15

one report of one of the two chambers that passed the law. While

a solitary reference may sometimes be enough to clear the mists

that obscure a statute's text the relevant inquiry, after all,

is qualitative, not quantitative the solitary reference to

which appellants cling is too slender a reed to be accorded

controlling weight under the totality of the circumstances that

obtain here. See, e.g., United States v. Taylor, 752 F.2d 757,

764 (1st Cir. 1985) (noting the hazards of relying on an isolated

fragment of legislative history there, a single paragraph in a

21-page committee report), rev'd on other grounds, 477 U.S. 131,

152 (1986).

The actual statement that the Secretary "would be

expected" to include "some form of depreciation" is couched in

vague and precatory terms. The statement is neither precise in

its content nor directory in its thrust. In itself, the

statement implies the existence of agency discretion. And,

moreover, whatever force it may possess is diluted because the

1977 amendments employ language that very closely parallels the

language of a previous regulation, on the same subject, that

excluded depreciation. When Congress codifies language that has

already been given meaning in a regulatory context, there is a

presumption that the meaning remains the same. See Commissioner

v. Keystone Consol. Indus., Inc., 113 S. Ct. 2006, 2011-12 (1993)

(explaining that Congress is presumed to be aware of settled

judicial and administrative interpretations of words when it

writes them into a statute); cf. Greenwood Trust Co. v.

16

Massachusetts, 971 F.2d 818, 827 (1st Cir. 1992) (noting that

when Congress borrows a word from a legal source, the word

usually brings along its prior judicial interpretations), cert.

denied, 113 S. Ct. 974 (1993).

We add two related points. First, we think the

traditional infirmities that attend legislative history

generally, see supra note 3 & accompanying text, are accentuated

where, as here, its proponents focus on a single, isolated,

somewhat tentative statement contained in a single document

produced by a single chamber of a bicameral legislature. Second,

although we recognize the uncertain value of post-enactment

materials, we deem the provocative statements in the 1980 House-

Senate conference report competent to lend an element of opacity

to already murky waters.

To sum up, the legislative history underlying section

2014(d), though suggestive, is simply not definitive enough to

suck the elasticity from the word "cost" and convey an

"unambiguously expressed intent of Congress." Chevron, 467 U.S.

at 842-43.

B B

The District Court's Slant The District Court's Slant

Nor do we share the district court's view that the

Secretary's change in position forfeits any entitlement to

deference because it occurred as a knee-jerk response to

jawboning that the Secretary mistakenly perceived as a

congressional mandate. In the first place, we know of no

17

sufficient basis for disregarding the Secretary's

characterization of the conference committee's report, which

accompanied the 1982 regulations, as a "suggestion." Hence, we

credit this characterization. By like token, we are obliged, in

the absence of meaningful impeachment, to accept the Secretary's

stated reason for making the change that households were, in a

real sense, being given an unwarranted anticipatory deduction for

the costs of replacing capital goods, and that the practice ought

to be stopped at face value. This is exactly the type of

"reasoned explanation" that, when accompanying an agency's change

of position, can evoke the deference contemplated by the Rust

Court. When an agency explicates a principled basis for revising

an interstitial rule in a plausible way, judges should not simply

shrug it off.

We make one final point. Courts must not lightly

assume that the Executive Branch is untutored, or that cabinet

officers are dolts. Here, for example, we are reluctant to

presume that the Secretary either overlooked or misread an

unbroken skein of cases, see, e.g., Bowsher v. Synar, 478 U.S.

714, 721-27 (1986) (reviewing caselaw and history of separation

of powers); Rhode Island v. Narragansett Indian Tribe, 19 F.3d

685, 699 (1st Cir.) (acknowledging that "[i]n our republican form

of government, legislators make laws by writing statutes"), cert.

denied, 115 S. Ct. 298 (1994), and concluded that he was duty

bound to rewrite the rule simply because the conference committee

groused about it. We think it is much more realistic to infer

18

that the conference committee's unredacted comments served as a

wake-up call, sparking the sort of reexamination that the Rust

Court explicitly sanctioned. In our tripartite system of

government, inter-branch communication and cooperation are not

terrible diseases, to be avoided at all costs, but, rather, are a

tested means of improving the health of the body politic. Thus,

evidence that such a rapport exists, without more, does not cast

doubt on the validity of agency action.

C C

Stage Two Stage Two

Once we have concluded both that Congress has not

spoken authoritatively on the precise question and that the

Secretary's change of heart is not outside Chevron's precedential

orbit, the remaining pieces of the puzzle fall neatly into place.

Fairly read, the amended regulation is reasonable in light of the

Act's avowed purpose of supplementing the purchasing power of

those unable to afford nutritionally adequate diets.5 The idea

that excluding depreciation from income more accurately reflects

the ability of a family to purchase food and, thus, better



5Indeed, the amended regulation, which uses "cost" in its
lay sense rather than in the specialized plutonomic sense, may
better serve the Act's purposes. In any given accounting period,
depreciation is likely to have scant effect on cash flow even
its proponents must admit that depreciation is, at best, an
approximation (that is, a guess) that exists primarily, if not
exclusively, on paper and it may bear little if any relation to
an actual decrease in the value of a capital asset. Moreover,
although depreciation may account for money set aside to replace
a piece of equipment, there is no guarantee that such equipment
will in fact be replaced with similar equipment or with any
equipment at all.

19

indicates the need for food stamps, is hardly heretical.

Implementing such an idea merely shifts the emphasis of the

relevant measure from an accountant's conception of profit and

loss to a layperson's conception of cash flow. Hence, we cannot

conclude that the Secretary's handiwork, as expressed in the

amended regulation, is "arbitrary, capricious, or manifestly

contrary to the statute." Chevron, 467 U.S. at 844.

The Stricklands themselves are a good illustration of

why the Secretary's second thought makes perfectly good

regulatory sense. In 1992 the Stricklands had revenue in hand of

more than twice the amount designated as the "maximum" income for

a family of two receiving food stamps. We believe that the

Secretary could reasonably conclude that households having this

degree of cash availability are no more in need of food stamps

than families with half as much take-home pay who are, by dint

of their income, ineligible for participation in the food stamp

program.

To be sure, the plaintiffs muster a cavalcade of

contentions that point in the other direction. They argue that

excluding depreciation gives a somewhat arbitrary preference to

self-employed food stamp recipients who elect to rent, rather

than purchase, business equipment, for rental payments are

deductible. They also argue that failure to recognize

depreciation discourages food stamp recipients from undertaking

certain business activities because, if an attributed self-

employment income overstates the real profit they receive, they

20

will forfeit food stamp eligibility. While these may constitute

valid arguments against the wisdom (or, more aptly put, the lack

of wisdom) of the amended regulation, they do no more than show

that both the plaintiffs' and the Secretary's readings of the

word "cost" as it is used in the statute are imperfect. By the

same token, however, both readings are plausible. In that

situation, it is up to the Secretary, not the courts, to balance

the relevant policy considerations and formulate a rule. The

implementation of a statutory term that can reasonably

accommodate two or more interpretations must be left to the

agency.

We hold, therefore, that the amended regulation is an

entirely permissible interpretation of the statute, and, as such,

is an entirely permissible exercise of the Secretary's authority.

Accord St. Amour v. Department of Social Welfare, 605 A.2d 1340

(Vt. 1992) (considering identical issue and upholding the

exclusion of depreciation under section 2014(d)).

IV. IV.

Conclusion Conclusion

We need go no further.6 The Secretary's decision to

exclude depreciation from the cost of producing self-employment

income is not inconsistent with the language and history of 7

U.S.C. 2014(d)(9). Moreover, the decision is grounded in a


6This case does not require us to decide whether self-
employed food stamp recipients must be given some alternative
deduction, such as a deduction for replacement costs, in
recognition of either the cost of acquiring capital goods or
their consumption in the course of producing income.

21

reasonable interpretation of the statute. Since the amended

regulation must be upheld under Chevron principles, the district

court's contrary judgment is

Reversed. Reversed.

22